[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-12831
_____

D.C. Docket No. 1:15-cv-01801-LMM

CHARLES L. HILL, JR.,

Plaintiff - Appellee,

versus

SECURITIES AND EXCHANGE COMMISSION,

Defendant - Appellant.


_____

No. 15-13738
_____

D.C. Docket No. 1:15-cv-00492-LMM

GRAY FINANCIAL GROUP, INC.,
LAURENCE O. GRAY,
ROBERT C. HUBBARD, IV,

Plaintiffs - Appellees,

versus

U.S. SECURITIES AND EXCHANGE COMMISSION,

                                        Defendant - Appellant.

_____

Appeals from the United States District Court
for the Northern District of Georgia
_____

(June 17, 2016)

Before ED CARNES, Chief Judge, JILL PRYOR and RIPPLE,[*] Circuit Judges.

JILL PRYOR, Circuit Judge:

Congress authorized the Securities and Exchange Commission ("SEC" or the "Commission") to bring civil actions to enforce violations of the Securities Exchange Act of 1934 (the "Exchange Act") and regulations promulgated thereunder.  The Commission is empowered to bring such an action either in federal district court or in an administrative proceeding before the Commission. *See* 15 U.S.C. §§ 78u(d), 78u-1, 78u-2, 78u-3.  An SEC administrative enforcement action culminates in a final order of the Commission, which in turn is reviewable exclusively by the appropriate federal court of appeals.  15 U.S.C. § 78y.

---

[*] Honorable Kenneth F. Ripple, United States Circuit Judge for the Seventh Circuit, sitting by designation.

The issue presented in this consolidated appeal is whether respondents in an SEC administrative enforcement action can bypass the Exchange Act's review scheme by filing a collateral lawsuit in federal district court challenging the administrative proceeding on constitutional grounds. In both now-consolidated cases, the district court held that it had jurisdiction to entertain such challenges. The court further concluded that at least one of the constitutional claims presented was substantially likely to succeed on the merits. To avoid what it determined would be irreparable harm, the district court enjoined the administrative proceedings. The Commission appealed.

After consideration of the parties' briefs and with the benefit of oral argument, we conclude that the district court lacked jurisdiction over the respondents' collateral attacks. We find it "fairly discernible" from the review scheme provided in 15 U.S.C. § 78y that Congress intended the respondents' claims to be resolved first in the administrative forum, not the district court, and then, if necessary, on appeal to the appropriate federal court of appeals. *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 207 (1994) (internal quotation marks omitted). We see no indication that Congress intended to exempt the type of claims the respondents raise here from the review process it created. *See id.*; *Elgin v. Dep't of Treasury*, 132 S. Ct. 2126, 2136-40 (2012). Accordingly, we vacate the

3

district court's preliminary injunction orders and remand with instructions to dismiss the actions for lack of jurisdiction.

## I.  BACKGROUND

### A.    SEC Administrative Proceedings and Judicial Review

SEC administrative actions differ from cases brought in federal district court in several respects.  The administrative action begins when the Commission serves the respondent with an Order Instituting Proceedings ("OIP").  The Commission then presides over the action, but it typically delegates review to an Administrative Law Judge ("ALJ").  *See* 15 U.S.C. § 78d-1(a)-(b); 17 C.F.R. § 201.110.  Unlike an action brought in federal court, in a proceeding before the Commission the Federal Rules of Civil Procedure and Evidence do not apply, and the respondent does not enjoy the right to a jury trial.  Instead, the SEC's Rules of Practice, 17 C.F.R. § 201.100 *et seq.*, govern administrative proceedings.  Among other differences, the Rules of Practice provide for more limited discovery.  For example, the Rules of Practice allow the taking of depositions at the Commission's discretion, only upon a finding that the prospective witnesses will be unavailable to testify at the hearing.  *Id.* §§ 201.233(b), 201.234(a).  The Rules of Practice also do not provide for routine document production, instead requiring parties to request that the ALJ issue subpoenas.  *See id.* § 201.232.  Administrative actions proceed relatively quickly along fixed timelines set by the rules.  *See id.* § 201.360(a)(2).

4

When the Commission delegates review to an ALJ, the ALJ holds an evidentiary hearing and then renders an initial decision with factual findings and conclusions of law. *Id.* § 201.360(a)(1), (b). Either party may appeal the initial decision to the Commission, *id.* § 201.410, or the Commission may review it on its own initiative. *Id.* § 201.411(c). The Commission's review authority is broad. "[It] may affirm, reverse, modify, set aside or remand for further proceedings, in whole or in part, an initial decision by a hearing officer and may make any findings or conclusions that in its judgment are proper and on the basis of the record." *Id.* § 201.411(a). Conversely, if there is no appeal to the Commission, and the Commission declines to exercise its right to review *sua sponte*, the ALJ's initial decision becomes the final decision of the Commission for all purposes. 15 U.S.C. § 78d-1(c). Regardless of whether the initial decision is appealed, the administrative process culminates in a final order of the Commission.

The aggrieved party may then seek review in the United States Court of Appeals either for the circuit in which she resides or has her principal place of business or for the District of Columbia Circuit. 15 U.S.C. § 78y(a)(1). The aggrieved party may request that the Commission stay enforcement of its order pending judicial review. 17 C.F.R. § 201.401. Section 78y then provides a detailed scheme for appellate court review of final Commission orders.

5

The process of obtaining judicial review begins with the filing of a petition in the court of appeals that triggers the court's jurisdiction.  15 U.S.C. § 78y(a)(1), (3).  Upon the filing of the record in the court of appeals, the court's jurisdiction becomes exclusive.  *Id.* § 78y(a)(3).  Although other provisions of the Exchange Act provide limited district court jurisdiction over some types of securities-related claims,[1] the Act contains no express authorization for district court review of a final Commission order.

Section 78y then details how the court of appeals reviews a final order of the Commission.  The statute grants the reviewing court broad authority "to affirm or modify and enforce or to set aside the [final Commission] order in whole or in part."  *Id.* § 78y(a)(3).  The reviewing court must accept the Commission's factual findings that are supported by substantial evidence, but, if appropriate, the court may remand to the Commission for additional fact finding.  *Id.* § 78y(a)(4)-(5).  The statute prohibits the reviewing court from considering a newly-raised objection to a final Commission order unless there was "reasonable ground" for failing to raise the objection first before the Commission.  *Id.* § 78y(c)(1).  The statute generally authorizes the reviewing court to stay enforcement of the

---

[1] *See, e.g.*, *id.* §§ 78u(d), 78u-1, and 78u-3 (authorizing the Commission to seek, in federal district court, injunctive relief, civil penalties, or a temporary escrow order).

6

Commission's order pending judicial review "to the extent necessary to prevent irreparable injury."  *Id.* § 78y(c)(2).

## B.    Factual Background

### 1.    Charles L. Hill, Jr.

The respondent in the first case in this consolidated appeal is Charles L. Hill, Jr., a real estate developer in Georgia who is not registered with the SEC.  In June and early July, 2011, Mr. Hill purchased several thousand shares of stock in a company called Radiant Systems, Inc. ("Radiant").  On July 11, 2011, after the markets closed, Radiant announced a merger agreement with NCR Corporation. The next day, Mr. Hill sold all of his Radiant shares, profiting in the amount of approximately $744,000.  Mr. Hill maintained that he was unaware of the merger before its public announcement.  Nonetheless, in February 2015, after a two-year investigation in which Mr. Hill cooperated fully with the SEC, the Commission served him with an OIP.  The SEC sought a cease and desist order, a civil penalty, and disgorgement, alleging that Mr. Hill unlawfully profited from non-public information.

The ALJ scheduled a hearing on the OIP for June 15, 2015.  In the meantime, Mr. Hill filed two motions for summary disposition, the first challenging the merits of the claims against him and the second raising as affirmative defenses constitutional arguments going to the heart of the

7

administrative process itself.  Specifically, in the second motion Mr. Hill argued

that (1) the administrative proceeding violates the removal protections of Article II

of the United States Constitution because ALJs are protected by two layers of

tenure, (2) administrative enforcement actions before an ALJ violate the non-

delegation doctrine under Article I of the Constitution, and (3) the grant of

discretion to the Commission to bring this action in an administrative forum

violates his Seventh Amendment right to a jury trial.  In separate orders, the ALJ

denied both motions.  As regards the constitutional issues, the ALJ concluded that

he lacked authority to rule on the constitutionality of a particular provision of the

Exchange Act and thus could not resolve Mr. Hill's second and third arguments.

The ALJ also expressed doubt that he had the authority to reach Mr. Hill's first

argument, but nonetheless rejected it on the merits.

Five days after the ALJ issued his order on Mr. Hill's constitutional

challenges, Mr. Hill filed in federal district court a complaint and motion for a

temporary restraining order seeking to enjoin the SEC proceedings.  Mr. Hill raised

the same constitutional arguments in the district court that he had raised before the

ALJ and, in an amended complaint, added an additional claim under the

Appointments Clause of Article II of the Constitution.  This new claim asserted

that, as constitutional inferior officers, the ALJs must be appointed by the

President, department heads, or courts of law.  Because the SEC conceded that

8

ALJs are not appointed in that manner, Mr. Hill contended that the appointment of the ALJ in his case was unconstitutional.  The SEC countered that the district court lacked jurisdiction over these claims because Congress designated the administrative forum and appeal procedure of § 78y as the exclusive avenue for deciding them.  The SEC also disputed the merits of Mr. Hill's claims.

After oral argument, the district court issued a thorough order rejecting the SEC's jurisdictional argument and holding that the Commission's ALJs were inferior officers subject to the Appointments Clause.  Because the ALJ was not appointed by the President, department heads, or courts of law, the district court held, the ALJ's appointment likely was unconstitutional.[2]  On this basis, the court granted Mr. Hill's motion for a temporary restraining order.  *Hill v. SEC*, 114 F. Supp. 3d 1297, 1320 (N.D. Ga. 2015).  The Commission appealed.

### 2.    The Gray Respondents

The second case in this consolidated appeal was brought by Gray Financial Group, Inc. ("Gray Financial"), its founder and principal Laurence O. Gray, and its Co-Chief Executive Officer Robert C. Hubbard (collectively the "Gray respondents").  Gray Financial is an investment advisory firm registered with the SEC and the States of Georgia and Michigan.  The firm provides financial

---

[2] The court declined to reach whether the ALJ's two-layer tenure system violated Article II's removal protections and rejected Mr. Hill's remaining arguments.

consulting services to a variety of public and private entities. In August 2013, the Commission began investigating whether Gray Financial complied with the Georgia Public Retirement Systems Investment Authority Law ("Georgia Pension Law"), O.C.G.A. § 47-20-87. After about a year, the SEC reached a preliminary conclusion that the Gray respondents had violated federal securities laws by offering an investment fund not in compliance with the Georgia Pension Law. The SEC urged the Gray respondents to settle or else they would risk an enforcement action brought in an administrative proceeding.

Based on the SEC's threat, in February 2015 the Gray respondents filed a complaint in federal district court seeking to enjoin the impending SEC administrative proceeding and requesting a declaratory judgment that the dual layer of tenure for SEC ALJs violates the removal protections of Article II. In May 2015, the Commission served the Gray respondents with an OIP, initiating an administrative enforcement action against them. The Gray respondents then filed an amended complaint, adding the allegation that the appointments process for SEC ALJs also violates Article II. Then, on June 15, 2015, the Gray respondents filed a motion for preliminary injunction.

After oral argument, the district court—with the same judge presiding as in Mr. Hill's case—again concluded that it had subject matter jurisdiction and that the hiring of SEC ALJs violated the Appointments Clause because the ALJs were

10

inferior officers under the Constitution.  The district court thus granted the Gray respondents' motion for a preliminary injunction.  *Gray Fin. Grp., Inc. v. SEC*, No. 1:15-cv-0492-LMM, 2015 WL 10579873, at *16 (N.D. Ga. Aug. 4, 2015).  The Commission appealed.  Upon the respondents-appellees' consent motion, we consolidated the Commission's two appeals.

## II.  ANALYSIS

We review the district court's determination of subject matter jurisdiction *de novo*.  *Doe v. FAA*, 432 F.3d 1259, 1261 (11th Cir. 2005).  Federal district courts generally have jurisdiction over claims raising constitutional challenges that seek declaratory and injunctive relief.  *See* 28 U.S.C. §§ 1331, 2201.  Congress may allocate initial review of such claims to an administrative body, however.  *See Thunder Basin*, 510 U.S. at 207.  To determine whether Congress has done so, we first decide whether its intent to preclude initial review in the district court is "fairly discernible in the statutory scheme."  *Id.* (internal quotation marks omitted); *see also Elgin*, 132 S. Ct. at 2133-33.  We then ask whether the litigants' "claims are of the type Congress intended to be reviewed within this statutory structure." *Thunder Basin*, 510 U.S. at 212; *accord Elgin*, 132 S. Ct. at 2136-40.  The second part of our analysis focuses on whether the litigant's claims will receive meaningful judicial review within the statutory structure.  *See Thunder Basin*, 510 U.S. at 212-14;  *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S.

11

477, 490-91 (2010).  We also consider whether "agency expertise could be brought to bear on the . . . questions presented" and the extent to which the litigants' claims are "wholly collateral to [the] statute's review provisions."  *Thunder Basin*, 510 U.S. at 212, 214-15 (alteration adopted and internal quotation marks omitted).

The Supreme Court applied this framework in three cases that guide our analysis here.  In the first, *Thunder Basin Coal Company v. Reich*, the Court held that a statutory review procedure applicable to regulations promulgated under the Federal Mine Safety and Health Amendments Act of 1977, 30 U.S.C. § 801 *et seq.* (the "Mine Act"), which is nearly identical to the review procedure under the Exchange Act at issue here, precluded preenforcement judicial review in the district court of a constitutional challenge to a Mine Act regulation.  *Thunder Basin*, 510 U.S. at 218.  The Court reached a contrary conclusion in *Free Enterprise Fund v. Public Company Accounting Oversight Board*, however.  561 U.S. 477.  There, the Supreme Court held that 15 U.S.C. § 78y, the same statutory review procedure at issue in this case, did not clearly indicate Congressional intent to preclude initial review in the district court of a challenge to the existence of the Public Company Accounting Oversight Board (the "PCAOB"), a private nonprofit corporation under the SEC's oversight, whose actions do not necessarily result in a final Commission order or rule.  *Id.* at 489-91.  And finally, in *Elgin v. Department of the Treasury*, the Court held that it was fairly discernible from the review

process in the Civil Service Reform Act of 1978 ("CSRA"), 5 U.S.C. § 1101 *et seq.*, that Congress intended to preclude district court jurisdiction over a constitutional challenge to a statute authorizing the termination of federal employees who failed to register for the Selective Service.  132 S. Ct. at 2140.

Applying the *Thunder Basin* two-part framework based on our reading of these three Supreme Court cases, discussed in more detail below, persuades us that the respondents' claims in this case must proceed initially in the administrative forum and then through the judicial review scheme Congress established in § 78y. We therefore conclude, consistent with three of our sister circuits, that the district court lacked subject matter jurisdiction.  *See Tilton, et al. v. SEC*, __ F.3d__, No. 15-2103, 2016 WL 3084795 (2d Cir. June 1, 2016); *Jarkesy v. SEC*, 803 F.3d 9 (D.C. Cir. 2015); *Bebo v. SEC*, 799 F.3d 765 (7th Cir. 2015), *cert. denied*, 136 S. Ct. 1500 (2016).[3]

## A.    Whether Congressional Intent to Preclude District Court Review of SEC Administrative Proceedings Is "Fairly Discernible in the Statutory Scheme"

Applying the test established in *Thunder Basin*, we first must decide whether it is "fairly discernible" from the "text, structure, and purpose" of § 78y that Congress intended this statute to provide the exclusive means for judicial review of

---

[3] The decisions in *Bebo* and *Jarkesy* were unanimous.  The Fourth Circuit is also considering this jurisdictional issue.  *See Bennett v. SEC*, No. 15-2584 (4th Cir. appeal docketed Dec. 28, 2015).

an SEC administrative action. *Elgin*, 132 S. Ct. at 2133 (internal quotation marks omitted). We discern from the text of the statute that Congress sought to foreclose district court review of administrative proceedings. *See id*.; *Thunder Basin*, 510 U.S. at 207-09.

*Thunder Basin* is particularly instructive. At issue there was 30 U.S.C. § 816(a), the statutory scheme Congress provided for reviewing decisions of the Federal Mine Safety and Health Review Commission (the "Mine Safety Commission"). *Id.* at 207-12. The Mine Safety Commission is authorized to impose civil monetary penalties for, among other infractions, violations of the regulations promulgated under the Mine Act. *Id.* at 204, 208. The petitioner, Thunder Basin Coal Company ("Thunder Basin"), filed a lawsuit in federal district court to challenge one such regulation, arguing among other points that requiring it to undergo a statutory review process similar to the process set forth in § 78y violated its rights under the Due Process Clause of the Fifth Amendment. *Id.* at 204-05. The Court held that the text and structure of the Mine Act demonstrated Congress's intent to preclude the petitioner's challenge in federal district court. *Id.* at 207-09.

As the District of Columbia Circuit recognized in *Jarkesy*, the text of the Mine Act's judicial review provisions at issue in *Thunder Basin* are "nearly identical" to those governing SEC final orders at issue here. *Jarkesy*, 803 F.3d at

14

16-17.  Both schemes provide exclusive jurisdiction upon the filing of the record in the appropriate court of appeals and grant broad authority to that court to affirm, modify, enforce, or set aside a final agency order in whole or in part.  *Compare* 15 U.S.C. § 78y(a)(1)-(3), *with* 30 U.S.C. § 816(a)(1).  The Mine Act and the Exchange Act both also circumscribe, in essentially the same manner, the appellate court's authority to consider new arguments, reject findings of fact, remand for additional fact finding, or issue a stay.  *Compare* 15 U.S.C. § 78y(a), *with* 30 U.S.C. § 816(a).  We agree with *Jarkesy* that § 78y is materially indistinguishable from § 816(a) and thus evinces Congressional intent to resolve challenges to Commission orders first in the administrative forum and then on appeal to the appropriate courts of appeal.

We find *Elgin* similarly helpful.  In *Elgin*, the Supreme Court considered the CSRA's "comprehensive system for reviewing personnel action taken against federal employees."  *Elgin*, 132 S. Ct. at 2130 (internal quotation marks omitted).  The CSRA set forth in "painstaking detail" the method for covered employees to obtain review of adverse employment actions, first before the Merit Systems Protection Board ("MSPB") and then on appeal exclusively to the United States Court of Appeals for the Federal Circuit.  *Id.* at 2134; *see also id.* at 2130-31 (citing 5 U.S.C. §§ 7513(d), 7701(a)(1)-(2), 7703(b)(1); 28 U.S.C. § 1295(a)(9)).  The CSRA's review provision applies to "[a]ny employee or applicant for

15

employment adversely affected or aggrieved by a final order or decision of the [MSPB]." 5 U.S.C. § 7703(a)(1). The Supreme Court held that given the comprehensive and detailed statutory review scheme set forth in the CSRA, it was "fairly discernible that Congress intended to deny [covered] employees an additional avenue of review in district court." *Elgin*, 132 S. Ct. at 2134.

Likewise, § 78y makes it clear that Congress intended to preclude parallel federal district court litigation involving challenges to final Commission orders. Although perhaps not painstaking, the detail in § 78y indicates that Congress intended to deny aggrieved parties another avenue for review. Moreover, like the CSRA, § 78y is comprehensive, covering all final Commission orders without exception. We are thus convinced that Congress intended any challenge to a final Commission order, even one framed as a constitutional challenge to the administrative process itself, to receive judicial review under § 78y.

The Supreme Court's decision in *Free Enterprise Fund*, which construed § 78y's reach, does not require a contrary conclusion. There, the PCAOB began a formal investigation into the auditing practices of an accounting firm. *Free Enter. Fund*, 561 U.S. at 487. The firm and an associated nonprofit organization then sued the PCAOB in federal district court, arguing that the PCAOB's existence was unconstitutional because, among other reasons, its members were not properly appointed pursuant to the Appointments Clause. *Id.* The PCAOB responded that

16

§ 78y governed the petitioner's challenge, and therefore the case must be dismissed for lack of jurisdiction. The Supreme Court disagreed. "Section 78y provides only for judicial review of *Commission* action," the Court reasoned, "and not every [PCAOB] action is encapsulated in a final Commission order or rule." *Id.* at 490. In other words, although the text of § 78y covered all final Commission orders, it did not cover all PCAOB action. Thus, the Supreme Court summarily rejected the government's argument that § 78y indicated Congressional intent to direct the petitioner's challenge into the administrative forum. *Id.* at 489.

Here, in contrast, the respondents do challenge Commission action—action which, if allowed to proceed, necessarily will result in a final Commission order. Section 78y provides that respondents must raise *all* objections to an order of the Commission before it becomes final or risk waiving the objection on appeal. *See* 15 U.S.C. § 78y(c)(1). The respondents' constitutional challenges are essentially objections to forthcoming Commission orders; thus, they fall within the fairly discernible scope of § 78y's review procedures.

The respondents argue, and the district court concluded, that because the Exchange Act contemplates that some SEC violations may be resolved in district court rather than administrative proceedings, we cannot fairly discern Congressional intent to foreclose the respondents' challenges in this case. *See Hill*, 114 F. Supp. 3d at 1306 ("There can be no 'fairly discernible' Congressional intent

17

to limit jurisdiction away from district courts when the text of the statute provides the district court as a viable forum."). We disagree.

Most of the provisions on which the respondents rely expressly grant the government, not the respondent, the discretion to bring the action in the district court. *See, e.g.*, 15 U.S.C. §§ 78u(d), 78u-1, 78u-3 (the Commission); *Id.* §§ 78dd-2(d), 78dd-3(d) (the Attorney General). We agree with the D.C. Circuit in *Jarkesy* that "Congress granted the choice of forum to the [government], and that authority could be for naught if respondents . . . could countermand the [government's] choice by filing a court action." *Jarkesy*, 803 F.3d at 17; *see also Tilton*, 2016 WL 3084795, at *3 n.3 ("Congress's decision to vest the SEC with a choice between forums does not imply that the chosen forum should not be exclusive of the other. To the contrary—without such exclusivity, the SEC's statutory power to choose would be illusory.").

The remaining provisions the respondents highlight grant limited district court jurisdiction in special circumstances, standing in sharp contrast to § 78y's broad scope. As two examples, § 78u-3(d) grants the federal district courts narrow jurisdiction to review and, if appropriate, set aside, limit, or suspend a temporary cease-and-desist order entered by the Commission, and § 78u-6(h)(1)(B) authorizes a whistleblower to file a civil action in district court. *See also* 15 U.S.C. § 78bb(f)(2) (authorizing removal of securities class actions from state court to

18

federal district court).  That Congress carved out limited instances in which the district courts have jurisdiction over actions under the Exchange Act does not persuade us that Congress also intended for challenges to forthcoming Commission orders in administrative enforcement actions to be heard in district court.

We also find unpersuasive the respondents' reliance on *Abbott Laboratories v. Gardner* and the Exchange Act's savings clause, 15 U.S.C. § 78bb(a)(2).  In *Abbott Laboratories*, the Supreme Court held that a preenforcement challenge to regulations promulgated under one section of the Federal Food, Drug, and Cosmetic Act, as amended, 21 U.S.C. § 301 *et seq.* ("FDCA"), could be brought in federal district court despite a statutory review procedure applicable to a different section of the FDCA.  *Abbott Labs. v Gardner*, 387 U.S. 136, 144-45 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977).  This decision rested on the narrow nature of the review statute at issue, which provided "*special*-review procedures," *id.* at 142 (emphasis added), only for "certain enumerated kinds of regulations, not encompassing those of the kind involved" in that case, *id.* at 141 (footnote omitted).  Based on this limiting language, the Court concluded that the "special-review procedures" should be read narrowly; only those special agency decisions covered by the statute must be resolved under the review scheme.  *Id.* at 144-145.  And the FDCA's savings clause—which stated that "'[t]he remedies provided for in this subsection shall be in addition to and not

19

in substitution for any other remedies provided by law,'"—"buttressed" the Court's conclusion. *Id.* at 144 (quoting 5 U.S.C. § 701(f)(6) (1966)).

The respondents assert that, like the savings clause in *Abbott Laboratories*, the savings clause in the Exchange Act, 15 U.S.C. § 78bb(a)(2), supports the conclusion that Congress intended to preserve the district court's authority to hear constitutional challenges like the ones they raise here. It is true that the two savings clauses are substantially similar.[4] But unlike the narrow review statute in *Abbott Laboratories*, § 78y covers all timely-raised objections to a Commission's final order, without qualification. By its terms, § 78y includes the constitutional objections respondents raise here. *Abbott Laboratories* is therefore inapposite.[5]

Finally, we are unpersuaded by Mr. Hill's argument that had Congress wanted to preclude judicial review of his claims in the district court, it could have been clearer. Under the first step of our analysis, we do not require absolute clarity. Instead, we simply ask whether Congress's intent to preclude district court

---

[4] Section 78bb(a)(2) states, "Except as provided in subsection (f), [which is inapplicable here,] the rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity."

[5] *McNary v. Haitian Refugee Center, Inc.*, 498 U.S. 479 (1991), also does not compel a different conclusion. In *McNary*, the Supreme Court held that the limited judicial review provision of § 210(e) of the Immigration and Nationality Act, U.S.C. § 1160(e), which applies only to "'a determination respecting an application for adjustment of status,'" did not preclude "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications." *McNary*, 498 U.S. at 492 (quoting 8 U.S.C. § 1160(e)(1)). The text of the statute indicated that it was meant to cover a "single act rather than a group of decisions or a practice or procedure." *Id.* Conversely, as noted above, § 78y contemplates review of any objection to a final Commission order, without limitation. *See* 15 U.S.C. § 78y(c)(1).

review of the administrative proceeding is "fairly discernible in the statutory scheme." *Thunder Basin*, 510 U.S. at 207 (internal quotation marks omitted). We conclude that it is.

**B.      Whether the Respondents' Claims "Are of the Type Congress Intended to Be Reviewed within the Statutory Structure"**

We next turn to whether the specific claims the respondents raise "are of the type Congress intended to be reviewed within this statutory structure." *Id.* at 212. To make this determination, we first consider whether "a finding of preclusion could foreclose all meaningful judicial review" of the respondents' claims. *Id.* at 212-13; *see also Free Enter. Fund*, 561 U.S. at 489. We agree with the Second and Seventh Circuits that the first factor—meaningful judicial review—is "the most critical thread in the case law." *Bebo*, 799 F.3d at 774; *accord Tilton*, 2016 WL 3084795, at \*4. Thus, we focus our inquiry there. We conclude without doubt that the respondents' claims can receive meaningful judicial review under § 78y; thus, this first factor strongly favors the procedure the statute provides. We then briefly consider the remaining two factors:  whether the claims are "outside the agency's expertise" and "wholly collateral to a statute's review provisions." *Thunder Basin*, 510 U.S. at 212 (internal quotation marks omitted). Although these two factors are less conclusive, neither of them convinces us that Congress intended to exempt from the statutory review scheme the type of claims respondents raise.

21

### 1.    Availability of Meaningful Judicial Review

The respondents argue that § 78y fails to offer meaningful judicial review of their claims. Their primary contention is that § 78y only comes into play after the allegedly unlawful administrative process has run its course, at which time they will have suffered the very injury they seek to avoid, and no amount of postdeprivation relief can remedy it. Obviously, a court cannot enjoin a process that has already been completed. Thus, the argument goes, because § 78y cannot cure the injury they will suffer—enduring an unconstitutional administrative process—the respondents are entitled to bring their claims in the district court.

The respondents' argument fails at the outset. Enduring an unwanted administrative process, even at great cost, does not amount to an irreparable injury on its own. *See FTC v. Standard Oil Co. of Cal.*, 449 U.S. 232, 244 (1980) (holding that the substantial burden of defending oneself in an unlawful administrative proceeding does not constitute irreparable injury); *see also Bebo*, 799 F.3d at 775 ("Every person hoping to enjoin an ongoing administrative proceeding could make this argument, yet courts consistently require plaintiffs to use the administrative review schemes established by Congress.").

The respondents do not contest this point. They instead assert that the administrative process here is not just unlawful—as the petitioner in *Standard Oil* had contended—but unconstitutional. We fail to see what difference that makes

22

here.  Whether an injury has constitutional dimensions is not the linchpin in determining its capacity for meaningful judicial review.  *See Thunder Basin*, 510 U.S. at 213-215.  In *Thunder Basin*, the Supreme Court held that the petitioner could obtain meaningful judicial review through the administrative process, even though the petitioner challenged as unconstitutional that very process itself.  *Id.* at 215.  At issue was a provision of the Mine Act granting "'[a] representative of the [mine] operator and a representative authorized by his miners . . . an opportunity to accompany the Secretary [of Labor] . . . during the physical inspection of any coal or other mine.'"  *Id.* at 203 (quoting 30 U.S.C. § 813(f)).  The representatives were also entitled to "certain health and safety information" and could "promote health and safety enforcement."  *Id.*  A Mine Act regulation then authorized the miners to designate "'[a]ny person or organization'" to serve as their representative to participate in the "walk-around" physical inspection when it occurs.  *Id.* (quoting 30 C.F.R. § 40.1(b)(1)).  A related regulation required that the mine post the names, addresses, and telephone numbers of the designees.  *Id.* at 203-204 (citing 30 C.F.R. § 40.4).

The miners at Thunder Basin designated employees of their union to represent them; Thunder Basin believed this designation violated collective-bargaining principles and its right to exclude union organizers from the property. *Id.* at 204.  Thunder Basin thus objected to posting the names of the designees.  *Id.*

23

at 204-05.  Thunder Basin apparently could have complied with the posting

regulation and then sought review of the regulation.  *See id.* at 221 (Scalia, J.,

concurring in part and concurring in the judgment).  Or it could have refused to

comply, begun to incur daily penalties, and meanwhile challenged the regulation

through the statutory review process.  *Id.* at 217-18 (majority opinion).  Instead,

Thunder Basin filed a lawsuit in federal district court raising its collective-

bargaining arguments and adding a claim that requiring it to challenge the

regulation through the statutory review process would violate due process.  *Id.* at

205.

The Supreme Court held that even if the claims could not be addressed by

the agency, the "petitioner's statutory and constitutional claims . . . [could] be

meaningfully addressed in the Court of Appeals" under 30 U.S.C. § 816(a).  *Id.* at

215.  The Court rejected the argument that due process required initial review in

the district court because "neither compliance with, nor continued violation of, the

statute [would] subject [Thunder Basin] to a serious prehearing deprivation."  *Id.* at

216.  In particular, the Court determined that the alleged harm was "entirely

hypothetical," in part because the designees would not receive advance notice of

the physical inspection, and thus the nonemployee union representatives—

individuals who were unlikely to be on site when the unannounced inspection

occurred—were unlikely to be present to exercise walk-around rights.  *Id.* at 217.

24

And to the extent the petitioner would suffer any prehearing deprivation, the petitioner failed to "ma[ke] a colorable showing that full postdeprivation relief could not be obtained." *See id.* at 213.

Likewise, the respondents here have failed to show they will suffer any serious deprivation that the court of appeals cannot remedy under § 78y. For one thing, the Commission might decide that the respondents violated no securities laws and thus grant the SEC no relief. But even if the Commission imposes sanctions in its final order, the respondents will have two opportunities to obtain a stay of the Commission's final order pending judicial review, once before the Commission, 17 C.F.R. § 201.401, and a second time before the court of appeals, 15 U.S.C. § 78y(c)(2). It is therefore entirely possible the respondents will suffer no deprivation before receiving judicial review. Like the petitioner in *Thunder Basin*, the respondents' alleged pre-review injury is speculative at best. Moreover, even if the respondents are unable to obtain a stay pending judicial review, they have made no showing that full relief cannot be obtained after judicial review. To the contrary, § 78y grants the court of appeals the power to vacate a Commission order in whole, relieving the respondents of any liability. 15 U.S.C. § 78y(a)(3). This case simply does not present a situation where the respondents are likely to suffer irreparable injury while awaiting judicial review. *See Thunder Basin*, 510 U.S. at 218; *Tilton*, 2016 WL 3084795, at *6 ("Subsequent judicial review cannot

restore [financial and emotional resources of litigation], but it can vacate the resulting judgment and remand for a new proceeding.  That post-proceeding relief, although imperfect, suffices to vindicate the litigant's constitutional claim.").

The respondents' reliance on *Mathews v. Eldridge*, 424 U.S. 319 (1976), and its progeny is misplaced.  In *Eldridge*, the Supreme Court held that a recipient of Social Security disability benefits was permitted to raise in federal district court a due process challenge to the administrative exhaustion requirements under 42 U.S.C. § 405(g)—providing judicial review for adverse social security benefits determinations—in part because the plaintiff otherwise would suffer irreparable injury.  *Id.* at 331-32.  The Court reached its conclusion in *Eldridge* based not on the constitutional nature of the plaintiff's claims but instead on his "physical condition and dependency upon the disability benefits."  *Id.* at 331.  The Court observed that an "erroneous termination would damage [the plaintiff] in a way not recompensable through retroactive payments."  *Id.*; *accord Bowen v. City of N.Y.*, 476 U.S. 467, 483-84 (1986) (crediting the district court's finding that disabled claimants, like the plaintiff in *Eldridge*, would suffer irreparable injury not only because they were denied the benefits they sought, but also because they would experience the "ordeal of having to go through the administrative appeal process[,] [which] may trigger a severe medical setback," and thus "[i]nterim benefits [would] not adequately protect [the] plaintiffs from this harm" (internal quotation

26

marks omitted)); *Kreschollek v. S. Stevedoring Co.*, 78 F.3d 868, 873-75 (3d Cir. 1996) (concluding that despite Congress's fairly discernible intent to preclude district court jurisdiction over ordinary challenges to a worker's compensation decision, the administrative process was insufficient to provide full relief to a person whose benefits had been terminated). The respondents have made no showing that they will suffer a similar irreparable injury here.

Contrary to their assertions, the respondents are not in the type of precarious position the Supreme Court found unacceptable in *Free Enterprise Fund*. 561 U.S. at 489-90. There, the petitioners sought to bring a constitutional challenge to the existence of the PCAOB, which, among other tasks, "promulgates auditing and ethics standards, performs routine inspections of all accounting firms, demands documents and testimony, and initiates formal investigations and disciplinary proceedings." *Id.* at 485. The government argued that rather than bring a challenge in federal district court, the petitioners should simply ignore a request by the PCAOB, voluntarily "*incur* a sanction (such as a sizeable fine)," and then challenge that sanction in the administrative forum. *Id.* at 490. The Court held that this process did not offer a "meaningful avenue of relief." *Id.* at 490-91 (internal quotation marks omitted). Plaintiffs should not be required "to bet the farm by taking the violative action before testing the validity of the law." *Id.* at 490 (alteration adopted and internal quotation marks omitted).

27

Unlike the petitioners in *Free Enterprise Fund*, however, the respondents here need not bet the farm to test the constitutionality of the ALJs' appointment process.  On the contrary, the respondents have already taken the actions that allegedly violated securities laws.  *See Jarkesy*, 803 F.3d at 20 ("Jarkesy is already properly before the Commission by virtue of his alleged violations of those laws.  Indeed, the existence of the enforcement proceedings gave rise to Jarkesy's challenges."); *Bebo*, 799 F.3d at 774 (observing that the "key factor in *Free Enterprise Fund* that rendered § 78y inadequate is missing" where the plaintiff does not "need to risk incurring a sanction voluntarily just to bring her constitutional challenges before a court of competent jurisdiction"); *McNary*, 498 U.S. at 496-97 (holding that because most undocumented aliens would need to "voluntarily surrender themselves for deportation" in order to ensure judicial review through the statutory review process, their claims escaped meaningful judicial review).  In other words, to challenge the constitutional adequacy of the appointments of the SEC ALJs before the Commission, as opposed to the district court, the respondents must take no additional risks.

We are also unmoved by the Gray respondents' contention that the timing of their complaint in federal court—before the Commission initiated an administrative enforcement proceeding—grants them license to bypass the review procedures set out in § 78y.  We rejected a similar argument in *Doe v. FAA*.  432

28

F.3d 1259.  There, aircraft mechanics received certification from a school that, according to the Federal Aviation Administration ("FAA"), had fraudulently examined and certified some of its applicants.  *Id.* at 1260.  Because the FAA could not determine which mechanics had received fraudulent certificates, the agency decided to reexamine all mechanics who received their certificates from the school during the relevant time.  *Id.*  The respondents filed a federal lawsuit, seeking an injunction instructing the FAA how to reexamine the mechanics.  *Id.*

We found meritless the mechanics' argument that the administrative review process was inapplicable because the plaintiffs filed their lawsuit before the FAA took any certification action.  *Id.* at 1262-63.  "The mechanics," we concluded, "simply cannot avoid the statutorily established administrative-review process by rushing to the federal courthouse for an injunction preventing the very action that would set the administrative-review process in motion."  *Id.* at 1263; *see also Thunder Basin*, 510 U.S. at 208, 216 (recognizing that the "[p]etitioner's claims are 'pre-enforcement' only because the company sued before a citation was issued" and noting that the statutory judicial review procedure "does not distinguish between preenforcement and postenforcement challenges").  Similarly, here, it makes no difference that the Gray respondents filed their complaint in the face of

29

an impending, rather than extant, enforcement action.[6] The critical fact is that the Gray respondents can seek full postdeprivation relief under § 78y.

Finally, we reject the Gray respondents' contention that their claims will escape meaningful judicial review because of the "paltry discovery" available to them in the administrative forum. Gray Respondents' Br. at 26. On this point, *Elgin* is instructive. The petitioners in *Elgin* were former federal competitive service employees who wished to challenge in federal court the constitutionality of a law under which they were fired for failing to register for the Selective Service. *Elgin*, 132 S. Ct. at 2131. They asserted that the agency could not develop a sufficient factual record because it lacked the authority to decide the legal question

---

[6] Unlike the Gray respondents, we do not read the conclusions drawn in *Bebo*, *Jarkesy*, and *Tilton* as resting on the timing of the respondents' federal lawsuit. In *Bebo*, the court simply stressed that as a "respondent in a pending enforcement proceeding, [the plaintiff] does not need to risk incurring a sanction voluntarily just to bring her constitutional challenges before a court of competent jurisdiction." *Bebo*, 799 F.3d at 774. As explained above, the same is true for a person who faces an *impending* enforcement proceeding. The courts in *Jarkesy* and *Tilton* tangentially addressed the timing of the plaintiff's complaint when they considered the "wholly collateral" factor. But in *Jarkesy*, the court merely theorized in dicta that "[t]he result might be different if a constitutional challenge were filed in court before the initiation of any administrative proceeding (and the plaintiff could establish standing to bring the judicial action)." *Jarkesy*, 803 F.3d at 23. Likewise, in *Tilton*, the court simply observed that unlike the Appointments Clause claim in *Free Enterprise*, which "was not moored to any proceeding that would provide for an administrative adjudication and subsequent judicial review," the analogous claim in *Tilton* targeted an aspect of an ongoing proceeding. *Tilton*, 2016 WL 3084795, at *8. We are confident that the outcome would not have been different in *Jarkesy* or *Tilton* had the Appointments Clause claim challenged an aspect of a specific, forthcoming proceeding. In any event, we disagree with *Jarkesy* and *Tilton* to the extent they suggest that a district court might have jurisdiction to hear a constitutional challenge simply because it was filed before an impending administrative enforcement action.

30

and that the appellate court lacked any factfinding capabilities whatsoever. *Id.* at 2138.  The Supreme Court was unpersuaded.  "Even without factfinding capabilities," the Court reasoned, "the [appellate court] may take judicial notice of facts relevant to the constitutional question." *Id.*  Moreover, the CSRA "empowers the [agency] to take evidence and find facts for [appellate] review." *Id.*  As the Court explained, it made no difference if the agency lacked the authority to rule on the legal question because there was "nothing extraordinary in a statutory scheme that vests reviewable factfinding authority in a non-Article III entity that has jurisdiction over an action but cannot finally decide the legal question to which the facts pertain." *Id.*

We are equally confident that the respondents here can develop a sufficient factual record for meaningful appellate review under § 78y of their constitutional claims.  The administrative process includes adequate tools for the Gray respondents to draw out the facts necessary to mount their constitutional challenge relating to the ALJs' status as inferior officers.  The Gray respondents may call witnesses to testify, for example, and if a witness is unavailable to testify, the respondents may seek leave to take that witness's deposition at the Commission's discretion. *See* 17 C.F.R. §§ 201.233, 201.234.  The respondents may also request that the ALJ issue subpoenas when appropriate. *See id.* § 201.232.  These tools, although less robust than those provided by the Federal Rules of Civil Procedure,

31

do not leave the Gray respondents without a meaningful avenue to develop the record.

Moreover, to the extent the Commission fails to develop a sufficient factual record, the reviewing court not only may take judicial notice of facts relevant to the constitutional questions, *see* Fed. R. Evid. 201, but under § 78y(a)(5) it may also remand to the Commission for further factfinding.  Section 78y(a)(5) provides that if the appellate court determines, on a party's motion, that "additional evidence is material and that there was reasonable ground for failure to adduce it before the Commission, the court may remand the case to the Commission for further proceedings, in whatever manner and on whatever conditions the court considers appropriate."  15 U.S.C. § 78y(a)(5).  The combined effect of these mechanisms adequately allows for the development of a sufficient factual record.  In sum, we are without doubt that under § 78y the respondents can receive meaningful judicial review of their claims.

### 2.    The "Wholly Collateral" and Agency Expertise Factors

The remaining two factors do not cut strongly either way and thus do not persuade us that the respondents claims fall outside the scope of § 78y's review scheme.  *See Tilton*, 2016 WL 3084795, at *4 ("[A]lthough [the wholly collateral and agency expertise factors] present closer questions in this case, they do not persuasively demonstrate that the Appointments Clause claim falls outside the

32

scope of the SEC's overarching scheme."). We first consider whether "agency expertise [could] be brought to bear on the . . . questions presented." *Thunder Basin*, 510 U.S. at 215 (internal quotation marks omitted). *Elgin* tells us that it can here. *See Elgin*, 132 S. Ct. at 2140. In *Elgin*, the Supreme Court held that, if the agency can decide the merits of an underlying substantive claim and thus "obviate the need to address the constitutional challenge," its expertise sufficiently "could be brought to bear" on the constitutional issues. *Id.* (internal quotation marks omitted); *see also Thunder Basin*, 510 U.S. at 215 (holding that even if the agency is powerless to address the constitutional question, so long as the claims "can be meaningfully addressed in the Court of Appeals," the Court will not disregard the fairly discernible intent of Congress).

As in *Elgin*, here the Commission might decide that the SEC's substantive claims are meritless and thus would have no need to reach the constitutional claims. *See Tilton*, 2016 WL 3084795, at *10 ("[T]he Commission could rule that the appellants did not violate the Investment Advisers Act, in which case the constitutional question would become moot.").[7] We are thus satisfied that the

---

[7] In his dissenting opinion in *Tilton*, Judge Droney argued that unlike the constitutional claim at issue in *Elgin*, the Appointments Clause challenge is similar to a jurisdictional one, and thus should precede a decision on the merits. *Tilton*, 2016 WL 3084795, at *15 (Droney, J., dissenting). In other words, he suggests that the ALJ cannot simply punt on the Article II issue and go straight to the merits of the alleged securities law violations. Even if this were true, we don't think it matters. Perhaps the ALJ cannot obviate the need to decide the Article II question, but she can obviate the need for a court of appeals to decide it. Indeed, if a respondent wins on

Commission's expertise could be brought to bear in this way, even if its expertise could offer no added benefit to the resolution of the constitutional claims themselves.  Thus, it is of no moment that respondents' Article II claims themselves are outside the agency's expertise.  *See Free Enter. Fund*, 561 U.S. at 491 (holding that an Appointments Clause challenge to the PCAOB, which challenge was materially similar to the constitutional challenges raised here, did not require the type of "fact-bound inquir[y]" that called for agency expertise).[8]  In short, the agency expertise factor gives us "no reason to conclude that Congress intended to exempt [the respondents'] claims from exclusive review before" the Commission and the appropriate court of appeals.  *Elgin*, 132 S. Ct. at 2140.

Nor does the final factor—whether the respondents' claims are wholly collateral to the statute's review provisions—tip the scales in favor of judicial review outside of the procedures set forth in § 78y.  As the court in *Bebo*

---

the merits before the Commission, the respondent has not suffered an adverse decision entitling him to appellate review.  *See* 15 U.S.C. § 78y(a)(1) (authorizing only "aggrieved" persons to appeal an adverse order of the Commission).  This point "dovetails with our analysis of the availability of meaningful judicial review." *Tilton*, 2016 WL 3084795, at *10 (majority op.)  We agree with the majority opinion in *Tilton* that "a favorable Commission order, including one on statutory grounds, would provide an acceptable resolution of the Appointments claim and obviate any need for judicial review." *Id.*

[8] We note that during oral argument in this case, the SEC conceded that *Free Enterprise Fund* compels the conclusion that the respondents' Appointments Clause challenge is outside the Commission's expertise.

34

recognized, there are several ways to understand this factor. *Bebo*, 799 F.3d at 773; *see Tilton*, 2016 WL 3084795, at *8. We could simply compare the merits of the respondents' constitutional claims to the substance of the charges against them. *See Eldridge*, 424 U.S. at 330 (concluding that the petitioner's assertion that the Due Process Clause entitled him to a hearing before the termination of his disability benefits was "entirely collateral to his substantive claim of entitlement"). This approach arguably supports the respondents' position: even if the respondents were to prevail on their constitutional claims challenging the status of ALJs, they could still face a civil enforcement action in federal district court. *See Gupta v. SEC*, 796 F. Supp. 2d 503, 513 (S.D.N.Y. 2011) ("These allegations . . . would state a claim even if [the respondent] were entirely guilty of the charges made against him in the OIP."). In this sense, the respondents' claims are collateral to the SEC's substantive allegations.

We could focus instead on whether the respondents' claims are "wholly collateral to [the] *statute's review provisions*." *Elgin*, 132 S. Ct. at 2136 (emphasis added) (internal quotation marks omitted). The Court took this approach in *Elgin*, where federal employees did not dispute the merits of the charges against them but instead challenged their removal by attacking the statute under which they were terminated. *Id.* at 2139-40. The Court observed that the constitutional claims were "the vehicle by which they [sought] to reverse the removal decisions, to return to

35

federal employment, and to receive the compensation they would have earned but for the adverse employment action." *Id.*  Their "challenge to [a] CSRA-covered employment action brought by CSRA-covered employees requesting relief that the CSRA routinely affords," therefore, was not wholly collateral to the CSRA review scheme. *Id.* at 2140.

Viewed through this lens, it is less clear whether the respondents' constitutional claims are wholly collateral to the review procedure set forth in § 78y.  The respondents attack the constitutionality of the ALJs and the administrative process as a vehicle to challenge the SEC's decision to bring the case before the Commission, suggesting that their constitutional challenges are not wholly collateral to the SEC's review provisions.  But the respondents' challenge is not a means to avoid liability altogether; as explained above, even if they prevail on their constitutional claims, they could face a civil enforcement action in federal district court.  Thus, their constitutional arguments are not a "vehicle by which they seek" to prevail on the merits.  In any event, whether we characterize the respondents' claims as wholly collateral, this factor does not convince us that Congress intended to grant the respondents a license to bypass § 78y in the face of our conclusion that the statute guarantees meaningful judicial review.  *See Thunder Basin*, 510 U.S. at 215 (deciding the jurisdictional issue without concluding that the claims were wholly collateral).  We agree with the Seventh Circuit that "it is

'fairly discernible' that Congress intended [the respondents] to proceed exclusively through the statutory review scheme established by § 78y because that scheme provides for meaningful judicial review in 'an Article III court fully competent to adjudicate petitioners' claims.'" *Bebo*, 799 F.3d at 774 (quoting *Elgin*, 132 S. Ct. at 2137)).  We thus conclude that the respondents' claims are of the type Congress intended § 78y to govern.

### III. CONCLUSION

Congress set forth a detailed process for exclusive judicial review of final Commission orders in the federal courts of appeals.  15 U.S.C. § 78y.  From the text of the statute, we fairly discern Congress's general intent to channel all objections to a final Commission order—including challenges to the constitutionality of the SEC ALJs or the administrative process itself—into the administrative forum and to preclude parallel federal district court litigation.  We find no indication that the respondents' constitutional challenges are outside the type of claims that Congress intended to be reviewed within this statutory scheme.  Accordingly, the district court erred in exercising jurisdiction.  We vacate the district court's preliminary injunction orders and remand with instructions to dismiss each case for lack of jurisdiction.

**VACATED AND REMANDED WITH INSTRUCTIONS TO DISMISS FOR LACK OF JURISDICTION.**