**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-2584**

DAWN J. BENNETT; BENNETT GROUP FINANCIAL SERVICES, LLC,

Plaintiffs – Appellants,

v.

U.S. SECURITIES AND EXCHANGE COMMISSION,

Defendant - Appellee.

Appeal from the United States District Court for the District of Maryland, at Greenbelt.  Paul W. Grimm, District Judge.  (8:15-cv-03325-PWG)

Argued:  October 28, 2016          Decided:  December 16, 2016

Before MOTZ, KING, and DUNCAN, Circuit Judges.

Affirmed by published opinion.  Judge Duncan wrote the opinion, in which Judge Motz and Judge King joined.

**ARGUED:** Andrew Joseph Morris, MORVILLO LLP, Washington, D.C., for Appellants.  Melissa N. Patterson, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:** Gregory Morvillo, Eugene Ingoglia, Ellen M. Murphy, MORVILLO LLP, New York, New York, for Appellants.  Benjamin C. Mizer, Principal Deputy Assistant Attorney General, Beth S. Brinkmann, Deputy Assistant Attorney General, Mark B. Stern, Mark R. Freeman, Megan Barbero, Daniel Aguilar, Tyce R. Walters, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Rod J. Rosenstein, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

DUNCAN, Circuit Judge:

Dawn Bennett and her firm, Bennett Group Financial Services, LLC, (collectively, "Bennett") appeal the district court's dismissal on jurisdictional grounds of her suit challenging the constitutionality of the administrative enforcement proceeding that the Securities and Exchange Commission ("SEC" or "Commission") brought against her. For the following reasons, we join the Second, Seventh, Eleventh, and D.C. Circuits that have addressed the issue, and affirm.

I.

A.

Congress has authorized the Commission to address potential violations of the federal securities laws, including the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78a et seq., either by filing an enforcement action in federal district court or by instituting an administrative proceeding. See, e.g., 15 U.S.C. §§ 78u(d), 78u-1(a)(1), 78u-3. Congress further authorized the SEC to delegate its adjudicative functions to an administrative law judge ("ALJ"), while "retain[ing] a discretionary right to review the action of any such" ALJ on "its own initiative" or at a party's request. Id. § 78d-1(a)-(b). The SEC implemented this framework through its Rules of Practice. See 17 C.F.R. § 201.110. When the

2

Commission initially assigns enforcement proceedings to an ALJ, the ALJ holds a hearing and makes an initial decision, which the respondent may appeal by petitioning for review before the full Commission. Id. §§ 201.360(a)(1), 201.410(a). The Commission reviews the ALJ's initial decision de novo and may take additional evidence. See id. §§ 201.410, 201.411(a), 201.452; see also Jarkesy v. SEC, 803 F.3d 9, 13 (D.C. Cir. 2015). Whether or not a party seeks further administrative review, the Commission alone--not the ALJ--has the authority to issue the agency's final decision in the proceeding. 17 C.F.R. § 201.360(d)(2).

In the Exchange Act, Congress has provided that judicial review of administrative enforcement proceedings shall be available directly in the appropriate court of appeals. 15 U.S.C. § 78y(a)(1). When an aggrieved person files a petition, the jurisdiction of the court of appeals becomes exclusive. Id. 78y(a)(3). For judicial review of final Commission orders, the Exchange Act specifies what constitutes the agency record, id. § 78y(a)(2), the standard of review, id. § 78y(a)(4), and the process for seeking a stay of the Commission order either before the Commission or in the court of appeals, id. § 78y(c)(2). Against this background, we turn to the present dispute.

B.

Dawn Bennett founded Bennett Group Financial Services, LLC as an independent investment firm around 2006. Around January 2012, the Commission began investigating Bennett and her firm.

On September 9, 2015, the Commission instituted an administrative proceeding against Bennett to determine whether, as the SEC's Division of Enforcement alleged, Bennett had violated the antifraud provisions of the federal securities laws by materially misstating the amount of assets managed for investors, materially misstating investor performance, and failing to adopt and implement adequate written policies for calculating and advertising assets managed and investment returns. In re Bennett Grp. Fin. Servs., LLC, Exchange Act Release No. 75864, 2015 WL 5243888 (Sept. 9, 2015) (order instituting proceedings). The proceedings sought to determine whether Bennett's conduct warranted disgorgement, civil monetary penalties, a cease-and-desist order, and a securities industry bar. Id. at *9–10. The Commission assigned the initial stages of the proceeding to an ALJ. Id. at *10. The ALJ scheduled a hearing on the merits of Bennett's case for January 25, 2016. In re Bennett Grp. Fin. Servs., LLC, SEC Release No. 3269, 2015 WL 12766768 (Oct. 29, 2015) (ALJ scheduling order).

On October 30, 2015, Bennett filed this action in federal district court, seeking to enjoin the administrative proceeding

4

and a declaration that it is unconstitutional. The Complaint alleged that the SEC's administrative enforcement proceedings violate Article II of the United States Constitution, which provides that "[t]he executive Power shall be vested in a President of the United States," U.S. Const. art. II, § 1, cl. 1, and that "the Congress may by Law vest the Appointment of such inferior Officers, as they think proper . . . in the Heads of Departments," id. § 2, cl. 2. Specifically, Bennett alleged that (1) ALJs count as "inferior Officers" and that the SEC's Commissioners--collectively, a "Head" of a "Department"--failed to appoint them, and (2) those ALJs enjoy at least two levels of protection against removal, which impedes presidential supervision over their exercise of "executive Power" and thereby contravenes the separation of powers. Cf. Free Enterprise Fund v. Pub. Co. Accounting Oversight Bd., 561 U.S. 477, 492 (2010).

The district court determined it lacked jurisdiction over Bennett's case and dismissed the action on December 10, 2015. Bennett timely appealed, seeking an injunction pending appeal and expedited review. Dkt. No. 9 (Dec. 28, 2015). This court denied both requests. Dkt. No. 19 (Jan. 22, 2016).[1]

---

[1] Subsequently, in its initial decision, the ALJ found that Bennett willfully violated numerous provisions of the securities laws, barred her from the industry, and imposed disgorgement and civil penalties collectively exceeding $4 million. Bennett Grp. Fin. Servs., LLC, Exchange Act Release No. 1033, 2016 (Continued)

5

II.

A.

We review de novo a district court's dismissal of a complaint for lack of subject-matter jurisdiction. Nat'l Taxpayers Union v. U.S. Soc. Sec. Admin., 376 F.3d 239, 241 (4th Cir. 2004).

B.

Federal district courts generally have "original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States." 28 U.S.C. § 1331; see also id. § 2201. However, Congress may expressly divest the district courts of jurisdiction over certain claims. See, e.g., Shalala v. Ill. Council on Long Term Care, Inc., 529 U.S. 1, 5 (2000). Congress can also impliedly preclude jurisdiction by creating a statutory scheme of administrative adjudication and delayed judicial review in a particular court. See, e.g., Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 207 (1994).

Three Supreme Court decisions principally inform our analysis of the inquiry presented: Thunder Basin Coal Company v.

WL 4035560, at *47–49 (ALJ July 11, 2016) (default decision). The Commission granted Bennett's petition for review, and briefing was to be completed by November 4, 2016. Bennett Grp. Fin. Servs., LLC, Exchange Act Release No. 4491, 2016 WL 4426912 (Aug. 22, 2016).

<u>Reich</u>, <u>Free Enterprise Fund v. Public Accounting Oversight Board</u>, and <u>Elgin v. Department of the Treasury</u>.[2] We discuss each in turn.

C.

1.

In <u>Thunder Basin</u>, the Supreme Court considered a petitioner's pre-enforcement challenge to the Federal Mine Safety and Health Amendments Act of 1977, 30 U.S.C. § 801 <u>et seq.</u> ("Mine Act"). 510 U.S. at 202. Thunder Basin, a coal company, objected to a Mine Act regulation that required it to post the names of certain union representatives authorized under the statute to accompany the Secretary of Labor during physical inspections of mines. <u>See</u> <u>id.</u> at 203–04 (citing 30 C.F.R. § 40.4). Rather than seek review of the regulation through the Mine Act's judicial-review scheme, Thunder Basin filed a lawsuit in federal district court alleging that requiring it to challenge the regulation through the statute's judicial-review scheme violated due process. <u>Id.</u> at 205.

The Supreme Court rejected Thunder Basin's argument. The Court described the Mine Act's "detailed structure for reviewing violations of 'any mandatory health or safety standard, rule, order, or regulation promulgated' under the Act." <u>Id.</u> at 207

---

[2] <u>Thunder Basin</u>, 510 U.S. 200 (1994); <u>Free Enterprise</u>, 561 U.S. 477 (2010); <u>Elgin</u>, 132 S. Ct. 2126 (2012).

7

(quoting 30 U.S.C. § 814(a)). Under the Mine Act, a mine operator can challenge an adverse agency order before an ALJ, subject to discretionary review by the Federal Mine Safety and Health Review Commission ("MSHRC"). Id. at 207–08; 30 U.S.C. § 823(d)(1). A mine operator can petition the MSHRC to review the ALJ's decision, or the MSHRC can direct a review at its own initiative. See 30 U.S.C. § 823(d)(1), (2)(A)(i). If the mine operator remains dissatisfied with the MSHRC's decision, it can challenge that decision in the appropriate federal court of appeals, which exercises "exclusive" jurisdiction over such cases. 30 U.S.C. § 816(a)(1); see also Thunder Basin, 510 U.S. at 208.

In reviewing the statutory scheme, the Court further noted that Congress demonstrated its ability to preserve district-court jurisdiction in limited circumstances: the Mine Act expressly authorizes district-court jurisdiction over actions by the Secretary of Labor to enjoin habitual violations and coerce payment of civil penalties; by contrast, "[m]ine operators enjoy no corresponding right but are to complain to the Commission and then to the court of appeals." Thunder Basin, 510 U.S. at 209 (footnote omitted). Based on the "comprehensive review process," the Court found that congressional intent to preclude district-court jurisdiction over pre-enforcement claims was "fairly discernible." Id. at 208, 216. Moreover, the Court

8

concluded that "petitioner's statutory and constitutional claims"--even a constitutional claim that challenged the legitimacy of the administrative process itself--could be "meaningfully addressed in the Court of Appeals." Id. at 215.

2.

Several years later, in Free Enterprise, the Supreme Court considered whether a district court could exercise jurisdiction over another pre-enforcement challenge--an Article II challenge to the Public Company Accounting Oversight Board ("PCAOB" or "Board")--despite the Exchange Act's judicial-review provision found at 15 U.S.C. § 78y. 561 U.S. at 489. The Board is a government-created private, nonprofit corporation that supervises accounting firms under the SEC's oversight. Under the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, 116 Stat. 745 (codified as amended in scattered sections of 15 U.S.C.), the SEC would appoint the PCAOB's five members, and only some of the Board's actions required SEC approval. Free Enterprise, 561 U.S. at 489-90. The statute's judicial-review scheme provided for review of the Commission's final rules and orders, such as sanctions imposed following administrative adjudication, but offered no path to judicial review for Board actions that did not require SEC approval. See id.

In Free Enterprise, the Board "inspected [an accounting] firm, released a report critical of its auditing procedures, and

9

began a formal investigation" of its practices. Id. at 487. Under the statute, none of those regulatory actions would result in a Commission rule or order, and so could not trigger a path to judicial review under § 78y. See id. at 489–90. Petitioners sued in federal district court, arguing that the Board contravened the separation of powers, because Board members enjoyed two layers of for-cause removal that impeded presidential supervision of executive power, and the Appointments Clause, because Board members were officers that required presidential appointment and Senate advice and consent. Id. at 487–88. Petitioners sought an injunction preventing the Board from exercising its powers, and a declaration that it was unconstitutional. Id. at 487.

The Free Enterprise Court held that § 78y did not preclude the district court from exercising jurisdiction on the facts presented. Id. at 491. Because the Board had not undertaken regulatory action that would yield a reviewable Commission order or rule, the petitioners would have had to "challenge a Board rule at random" or "bet the farm" by voluntarily incurring a sanction in order to trigger § 78y's mechanism for administrative and judicial review. Id. at 490 (citation omitted). The Court concluded that this was not a "'meaningful' avenue of relief." Id. at 491 (quoting Thunder Basin, 510 U.S. at 212). The Court also noted that the petitioner's

10

constitutional challenge was "'collateral' to any Commission orders or rules from which review might be sought," and "outside the Commission's competence and expertise" because it did not involve technical considerations or fact-bound inquiries. Id. at 490, 491. Therefore, the Court held that § 78y did not strip the district court of jurisdiction over petitioners' claims.

3.

In Elgin, the last decision in our trilogy, federal employees' failure to comply with a federal statute prompted their discharge from government agencies. Elgin v. Dep't of Treas., 132 S. Ct. 2126, 2131 (2012). Elgin, one of the employees, appealed his dismissal to the Merit Systems Protection Board ("MSPB") pursuant to a "comprehensive system" for resolving personnel decisions involving federal employees established by Congress in the Civil Service Reform Act of 1978 ("CSRA"). Id. at 2130 (quoting United States v. Fausto, 484 U.S. 439, 455 (1988)). That process requires adjudication first before the MSPB, subject to review in the Federal Circuit, which has exclusive jurisdiction over such appeals. Id. at 2130–31. Before the administrative process had concluded, however, Elgin joined a suit in federal district court in which petitioners argued that the statutes providing the basis for their discharge were unconstitutional. Id. at 2131.

11

The Elgin Court held that the CSRA precluded district-court jurisdiction over petitioners' claims. Id. at 2130. After reviewing the "painstaking detail" of the CSRA's provisions for federal employees to obtain judicial review of adverse employment actions, the Court concluded that Congress evinced a "fairly discernible" intent to deny covered employees an additional avenue of review in district court. Id. at 2134. Significantly, the Court rejected the argument that it should carve out constitutional claims from the judicial-review scheme and allow them to proceed in district court, noting that "a jurisdictional rule based on the nature of a[] . . . constitutional claim . . . is hazy at best and incoherent at worst." Id. at 2135.

Petitioners raised "three additional factors" to argue that their claims were not the type that Congress intended to exclude from the statute's judicial-review scheme, but the Court disagreed on each point. Id. at 2136. First, the Court emphasized that petitioners could receive meaningful review "in the Federal Circuit, an Article III court fully competent to adjudicate" their claims. Id. at 2137. Second, the Court reasoned that petitioners' constitutional claims were "the vehicle by which" petitioners sought to reverse the discharge orders, and thus were not "wholly collateral" to the statutory scheme. Id. at 2139–40. Third, even though the MSPB could not

12

rule on the constitutionality of the statute, the Court noted that its expertise could "otherwise be 'brought to bear'" on "many threshold questions that may accompany a constitutional claim." Id. at 2140 (quoting Thunder Basin, 510 U.S. at 214–15). Thus, petitioners could not proceed outside the statutory scheme and had to wait for judicial review in due course.

D.

Under Thunder Basin and its progeny, determining whether Congress has impliedly divested district-court jurisdiction over agency action involves a two-step inquiry. First, we ask whether Congress's intent to preclude district-court jurisdiction is "fairly discernible in the statutory scheme." Thunder Basin, 510 U.S. at 207; see also Elgin, 132 S. Ct. at 2132; Free Enterprise, 561 U.S. at 489. This involves examining the statute's text, structure, and purpose. Elgin, 132 S. Ct. at 2133. Second, we ask whether plaintiffs' "claims are of the type Congress intended to be reviewed within this statutory structure." Thunder Basin, 510 U.S. at 212; accord Elgin, 132 S. Ct. at 2136–40. At this second stage, we consider three factors. We focus on (1) whether the statutory scheme "foreclose[s] all meaningful judicial review." Thunder Basin, 510 U.S. at 212–13; see also Elgin, 132 S. Ct. at 2132; Free Enterprise, 561 U.S. at 490–91. We also consider (2) the extent to which the plaintiff's claims are "wholly collateral" to the

13

statute's review provisions, and (3) whether "agency expertise could be brought to bear on the . . . questions presented." Thunder Basin, 510 U.S. at 212, 215; see also Elgin, 132 S. Ct. at 2139–40; Free Enterprise, 561 U.S. at 490–91. Against this background, we apply the Thunder Basin framework to the facts before us.[3]

III.

A.

1.

At the first step of our analysis, we readily discern from the text and structure of the Exchange Act Congress's intent to channel claims first into an administrative forum and then on appeal to a U.S. Court of Appeals. Like the Mine Act in Thunder Basin, the Exchange Act includes a comprehensive scheme that provides for judicial review in the appropriate court of appeals, with substantially the same authority to affirm, modify, enforce, or set aside final agency orders in whole or in part, as well as authority to consider new arguments, reject findings of fact, remand to adduce new evidence, and issue stays. Compare 15 U.S.C. § 78y, with 30 U.S.C. § 816(a).

---

[3] Bennett concedes that the Thunder Basin framework governs whether the district court had jurisdiction to entertain her suit. Appellants' Br. at 8. Because we rule on jurisdictional grounds, we do not reach the merits of Bennett's claim.

14

Moreover, Congress demonstrated it knew how to preserve district-court jurisdiction, but declined to do so: "like the Mine Act, the statute here specifically authorizes district courts to exercise jurisdiction over certain actions brought by the agency but not by private parties." Nat'l Taxpayers Union, 376 F.3d at 243; see also Thunder Basin, 510 U.S. at 209. Compare 15 U.S.C. § 78u(d)(1), with 30 U.S.C. § 818. Our sister circuits have concluded that the provisions in the Exchange Act are "nearly identical," Jarkesy, 803 F.3d at 16–17, and "materially indistinguishable," Hill v. SEC, 825 F.3d 1236, 1242 (11th Cir. 2016), from the provisions in the Mine Act that the Thunder Basin Court found eliminated district-court jurisdiction. We agree. Congressional intent to deny collateral district-court challenges is "fairly discernible" from the text and structure of the Exchange Act.

2.

Bennett advances two main arguments at Thunder Basin step one, both of which we find unpersuasive.[4]

---

[4] Bennett also claims that the "painstaking detail" in the Exchange Act's judicial-review provision "tells us nothing about the scope of the SEC's jurisdiction to issue . . . orders." Appellants' Br. at 24. That argument leaps ahead: we decide here whether the district court had jurisdiction, which depends on the scope of the review scheme; we do not decide the scope of the SEC's jurisdiction or the constitutional legitimacy of ALJ appointments, questions that go to the merits.

15

She first relies on language in Free Enterprise taken out of context: "The Government reads § 78y as an exclusive route to review. But the text does not expressly limit the jurisdiction that other statutes confer on district courts. See, e.g., 28 U.S.C. §§ 1331, 2201. Nor does it do so implicitly." 561 U.S. at 489. Bennett argues that this language is dispositive of the issue before us because she, too, asserts an Article II challenge to the agency's authority.

Bennett reads too much into the Free Enterprise Court's conclusion, which is distinguishable on the facts.[5] Looking at the statutory text, the Court noted that § 78y "provides only for judicial review of Commission action, and not every Board action is encapsulated in a final Commission order or rule." Free Enterprise, 561 U.S. at 490. The Free Enterprise petitioners challenged the constitutionality of the Board members' appointments before enforcement; no Board rule directly implicated petitioners' challenge, nor had the Board issued a sanction against the petitioners. There was thus no reviewable "Commission action," nor even a guarantee that the Board's investigation would eventually culminate in reviewable "Commission action." The Court reasoned that, in such

---

[5] We also note that most of the Supreme Court's reasoning in Free Enterprise centered not on the text of the statute, but on the three Thunder Basin step-two factors, which we discuss below.

16

circumstances, Congress would not have intended petitioners to challenge a Board rule at random or incur a sanction in order to trigger judicial review under § 78y. The Court therefore allowed petitioners' claims against the Board to proceed outside the statutory scheme.

Here, by contrast, Bennett necessarily challenges "Commission action." Id. The Commission has instituted an administrative disciplinary proceeding against Bennett, and she challenges the legitimacy of the ALJ presiding over that proceeding. Unlike an inspection or investigation, a disciplinary proceeding results in a final Commission order. See 17 C.F.R. §§ 201.411(a), 201.360(d)(2). Thus, unlike the petitioners' claims in Free Enterprise, Bennett's constitutional claims "fall within the fairly discernible scope of § 78y's review procedures" because the proceedings will result in a reviewable Commission order. Hill, 825 F.3d at 1243.

Bennett's second textual argument fares no better. Bennett argues the Exchange Act's saving clause, which provides that "the rights and remedies provided by this chapter shall be in addition to any and all other rights and remedies that may exist at law or in equity," 15 U.S.C. § 78bb(a)(2), shows Congress did not intend to make the statutory remedies exclusive, and thus indicates that congressional intent to preclude district-court

17

review of constitutional claims of the type she raises here is not "fairly discernible" from the text.

Bennett cites Abbott Laboratories v. Garner, a case in which the Supreme Court found a similar saving clause "strongly buttressed" its conclusion that the statute had not eliminated district-court jurisdiction over a challenge to a regulation. 387 U.S. 136, 144 (1967), abrogated on other grounds by Califano v. Sanders, 430 U.S. 99 (1977). There, however, the Court emphasized that the judicial-review provision in the statute did not cover the particular claim at issue: The statute provided "special-review procedures" to deal with technical factual determinations, id. at 144, for "certain enumerated kinds of regulations, not encompassing those of the kind involved" in the case, id. at 141 (footnote omitted). Here, by contrast, the judicial-review provision in § 78y encompasses all objections to final agency action, including the constitutional objections Bennett raises. See Hill, 825 F.3d at 1244.[6]

---

[6] That a statute both grants exclusive jurisdiction to a U.S. Court of Appeals to review final agency action and includes a saving clause preserving rights and remedies is not internally inconsistent. For instance, Congress may have wanted to channel all claims to a particular forum (with the judicial-review scheme) while simultaneously preserving the Commission's ability to enforce state securities laws (via the saving clause). Further, the Supreme Court has recently construed the Exchange Act's saving clause narrowly when it found that the clause did not preserve antitrust claims. See Credit Suisse Sec. (USA) LLC v. Billing, 551 U.S. 264, 275 (2007).
(Continued)

18

We conclude that Congress's intent to preclude district-court jurisdiction is "fairly discernible" from the statutory scheme here.

B.

At the second stage of inquiry, in determining whether Bennett's claims "are of the type Congress intended to be reviewed within th[e] statutory structure," we consider the three Thunder Basin factors: (1) meaningful review, (2) collateral claims, and (3) agency expertise. 510 U.S. at 212. We address each factor in turn.[7]

---

[7] We agree with our sister circuits to have addressed the matter that meaningful judicial review is the most important factor in the Thunder Basin analysis. See Hill, 825 F.3d at 1245 (stating that meaningful judicial review is "the most critical thread in the case law") (quoting Bebo v. SEC, 799 F.3d 765, 774 (7th Cir. 2015)); Tilton v. SEC, 824 F.3d 276, 282 (2d Cir. 2016) (same); see also Nat'l Taxpayers Union, 376 F.3d at 243 (concluding that the Thunder Basin Court "rested its conclusion" on the availability of meaningful judicial review). But see Jarkesy, 803 F.3d at 22 (concluding that the Thunder Basin factors are "guideposts for a holistic analysis"). This interpretation is most consistent with the Supreme Court's treatment. In Thunder Basin, the Court noted that it would uphold district-court jurisdiction "particularly where a finding of preclusion could foreclose all meaningful judicial review." 510 U.S. at 212–13 (emphasis added); see also Elgin, 132 S. Ct. at 2132 (emphasizing the availability of some judicial review at beginning of Thunder Basin's two-step analysis); Free Enterprise, 561 U.S. at 490–91 (focusing on petitioners' inability to meaningfully pursue their constitutional claims under the administrative scheme and discussing meaningful relief when assessing whether the claims were "wholly collateral").

1.

With respect to meaningful review, Bennett contends that post-proceeding consideration of her constitutional challenge will be meaningless under § 78y because the violation is exposure to the unconstitutional proceeding, rather than any adverse decision on the merits.[8] Characterizing her claim as a "structural, prophylactic" challenge to the constitutionality of the forum itself, she contends that the only appropriate relief is an injunction to halt the allegedly unconstitutional administrative proceeding before it occurs. Appellants' Br. at 26.

The Supreme Court has rejected analogous arguments. With respect to the nature of the constitutional challenge, in Thunder Basin the Court recognized that "[a]djudication of the

_____

[8] In her reply brief, however, Bennett suggests that her true concern is a sanction. Reply Br. at 11. If so, then Bennett's claim has even less merit for two reasons. First, contrary to her assertion, her claim does "seek to affect the merits of the SEC proceeding," Appellants' Br. at 40, and so is not "wholly collateral." Second, the statute's judicial-review scheme ensures "meaningful review" because a court of appeals can remedy any sanctions order. If the Commission imposes sanctions in its final order, Bennett can request a stay pending judicial review before the Commission, 17 C.F.R. § 201.401, and before the court of appeals once it obtains exclusive jurisdiction, 15 U.S.C. § 78y(c)(2). Even if Bennett fails to obtain a stay, the court of appeals can vacate a Commission order in whole. Id. § 78y(a)(3). Bennett cannot demonstrate she is likely to suffer irreparable injury while awaiting judicial review. See Thunder Basin, 510 U.S. at 218; Hill, 825 F.3d at 1247.

20

constitutionality of congressional enactments has generally been thought beyond the jurisdiction of administrative agencies," 510 U.S. at 215 (quoting Johnson v. Robison, 415 U.S. 361, 368 (1974)), but that "[t]his rule is not mandatory." Id. The Thunder Basin Court--evaluating a similar judicial-review scheme under the Mine Act--found that petitioner's "constitutional claims . . . [could] be meaningfully addressed in the Court of Appeals," even when the petitioner there challenged the constitutionality of the administrative process itself. 510 U.S. at 215.[9] Moreover, the Supreme Court has similarly rejected the drawing of jurisdictional lines between agencies and federal courts based on the nature of constitutional claims. See Elgin, 132 S. Ct. at 2135–26 (noting that the line between facial, as-applied, and other constitutional challenges to statutes is "hazy at best and incoherent at worst"). Bennett fails to explain why an Appointments Clause challenge to the ALJ presiding over her proceeding differs appreciably from the contention in Thunder Basin that compelling a firm to challenge

---

[9] The Elgin Court similarly held that Congress can require plaintiffs to bring challenges to the constitutionality of statutes exclusively through the administrative scheme, even when the initial agency cannot rule on the constitutional question and the reviewing court lacks the power to conduct a hearing to find facts relevant to that determination. 132 S. Ct. at 2136–39.

21

a regulation through the Mine Act's judicial-review scheme violates due process. Both attack the legitimacy of the forum.[10]

Relatedly, Bennett argues that an unconstitutional proceeding is, itself, the harm that she should be allowed to avoid. The burden of defending oneself in an unlawful administrative proceeding, however, does not amount to irreparable injury. FTC v. Standard Oil Co. of Cal., 449 U.S. 232, 244 (1980). In Standard Oil, a company sued in district court to enjoin an ongoing administrative proceeding, arguing that the entire proceeding was unlawful because the agency had initiated it without the evidentiary basis required by statute. Id. at 235. The Court concluded that Standard Oil had to first complete the administrative process before reaching a federal court, and that this scheme provided meaningful judicial review. See id. at 238. The Court emphasized that "the expense and annoyance of litigation is 'part of the social burden of living under government.'" Id. at 244 (quoting Petroleum Expl., Inc. v. Pub. Serv. Comm'n, 304 U.S. 209, 222 (1938)). Bennett argues Standard Oil is inapposite because it did not involve a

---

[10] Moreover, in analogous cases, federal courts require litigants who unsuccessfully challenge the constitutionality of the initial tribunal--including the authority of the presiding decision maker--to endure the proceeding and await possible vindication on appeal. See Tilton, 824 F.3d at 285 (discussing cases).

22

constitutional claim.[11]  But that distinction makes no material difference for assessing the meaningfulness of judicial review here, because Thunder Basin and Elgin establish that petitioners can obtain meaningful review of constitutional claims through a statutory scheme similar to the one here.  Thunder Basin, 510 U.S. at 215-16; Elgin, 132 S. Ct. at 2136-39; see also Hill, 825 F.3d at 1246-47.[12]

---

[11] Bennett also argues that the injury is not just the expense and emotional toll of litigation, but also the "institutional integrity" of the government structure and her individual liberty interest.  The cases she cites undermine these arguments.  See CFTC v. Schor, 478 U.S. 833, 852 (1986) (upholding scheme that "hew[ed] closely to the agency model approved" previously by the Court "in Crowell v. Benson, 285 U.S. 22 (1932)"); Bond v. United States, 564 U.S. 211, 223 (2011) (stating that only when individuals "suffer otherwise justiciable injury" and participate "in a proper case" may they argue a structural constitutional objection, including that the structure protecting individual liberty is compromised).

[12] Bennett tries to distinguish Elgin and other similar cases denying alternative avenues of appeal by arguing that in those cases a reviewing court could provide "complete relief" by reversing the final order issued in the initial forum, whereas under the judicial-review scheme at issue here a court of appeals could never issue the injunctive relief she seeks because the proceedings would already have concluded.  This argument suggests that a court of appeals' order ruling on Bennett's Appointments Clause claim and vacating any sanction the Commission imposes would not provide "complete relief." That cannot be.  Bennett "has no inherent right to avoid an administrative proceeding at all."  Jarkesy, 803 F.3d at 27. Bennett also assumes she is entitled to her preferred remedy--an injunction in district court.  That is also incorrect.  As a general matter, the Supreme Court has long recognized that Congress may substitute remedies for illegal action.  Cf. Cary v. Curtis, 44 U.S. (3 How.) 236 (1845) (holding congressional statute withdrew traditional right of action against customs (Continued)

Furthermore, cases in which the Supreme Court has concluded that post-proceeding judicial review was not meaningful are distinguishable in critical respects. Bennett places principal reliance on Free Enterprise, where the Supreme Court held that § 78y was not an exclusive route to judicial review on the facts of that case. But unlike the plaintiffs in Free Enterprise, Bennett is already embroiled in an enforcement proceeding. To bring her challenge to the constitutionality of ALJ appointments before an Article III court, Bennett need not "bet the farm"--in fact, she need not take any additional risks. Id. at 490. She has already allegedly committed the actions that violate federal securities laws.

Bennett misreads Free Enterprise when she asserts that the case "applies the principle that a litigant who challenges the

---

collectors for illegally exacted duties and that aggrieved parties were not unconstitutionally deprived of all access to the courts because common-law remedies remained); McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco, Dep't. of Bus. Regulation of Fla., 496 U.S. 18, 36–37 (1990) (explaining that for unlawfully exacted taxes pre- or post-deprivation remedies satisfy due process). Thunder Basin applies this principle and says that Congress can require persons subject to administrative adjudication to pursue their claims exclusively there first before reaching an Article III court. 510 U.S. at 216. We also note that this case "does not present the 'serious constitutional question' that would arise if an agency statute were construed to preclude all judicial review of a constitutional claim." Thunder Basin, 510 U.S. at 215 n.20 (quoting Bowen v. Mich. Acad. of Family Physicians, 476 U.S. 667, 681 n.12 (1986)).

constitutionality of an agency forum is not required to endure the administrative process and incur a sanctions order before she has access to a court." Reply Br. at 11. That is too broad. What animated the Court in Free Enterprise was not that a plaintiff might need to defend against a sanctions order before the agency prior to reaching federal court, but rather that the choice petitioners in that case faced--incur penalties for noncompliance or challenge a rule at random--made federal judicial review not meaningfully accessible. See 561 U.S. at 490; see also Thunder Basin, 510 U.S. at 218. That concern is not present here, because the SEC has instituted disciplinary proceedings against Bennett and she can pursue her claims through the administrative scheme.[13]

---

[13] Other cases in which the Supreme Court has concluded that post-proceeding judicial review was not meaningful are distinguishable because they involved proceedings that "posed a risk of some additional and irremediable harm beyond the burdens associated with the dispute resolution process." Tilton, 824 F.3d at 286. In McNary v. Haitian Refugee Center, Inc., the Court allowed a class of undocumented aliens to raise a due-process challenge to immigration proceedings in district court, rather than pursue eventual review in a court of appeals pursuant to the statutory scheme, in part because most aliens could "ensure themselves review in courts of appeals only if they voluntarily surrender[ed] themselves for deportation," a "price . . . tantamount to a complete denial of judicial review for most undocumented aliens." 498 U.S. 479, 496–97. In Mathews v. Eldridge, the Court allowed a recipient of Social Security disability benefits to raise a due-process challenge to administrative exhaustion requirements in district court because "his physical condition and dependency upon the disability benefits [meant] an erroneous termination would damage him in a (Continued)

In short, we conclude Bennett can obtain meaningful judicial review of her constitutional claims under § 78y by proceeding in the administrative forum and raising her claims in a federal court of appeals in due course.

2.

Turning to the second Thunder Basin factor, the reference point for determining whether a claim is "wholly collateral" is not free from ambiguity. On the one hand, the Supreme Court has compared the merits of a constitutional claim to the substance of the charges at issue. See Eldridge, 424 U.S. at 330 (concluding that due-process claim was "entirely collateral to [the] substantive claim of entitlement"). On the other hand, the Court has considered whether a claim is "wholly collateral to [the] statute's review provisions." Elgin, 132 S. Ct. at 2136 (quoting Free Enterprise, 561 U.S. at 489). Under this standard, claims are not wholly collateral when they are "the vehicle by which [petitioners] seek to reverse" agency action. Id. at 2139.

Bennett argues for the first reading: Her constitutional claim is "wholly collateral" to the proceeding "because it challenges the legality of the forum itself and does not seek to

---

way not recompensable through retroactive payments." 424 U.S. 319, 331 (1976). Bennett has not shown that she will suffer similar irreparable injury.

26

affect the merits of [the] SEC proceeding." Appellants' Br. at 40. At one level, this makes conceptual sense: Even if she is successful in challenging the appointment of the Commission's ALJs, the SEC could still bring a civil enforcement action in district court on the same substantive charges.

However, we think the second reading is more faithful to the more recent Supreme Court precedent, even though it reduces the factor's independent significance. Moreover, we are joined in that interpretation by several of our sister circuits that have considered the issue. See Jarkesy, 803 F.3d at 22–23; Tilton, 824 F.3d at 287–88. But see Bebo, 799 F.3d at 773–74 (declining to decide among interpretations); Hill, 825 F.3d at 1251–52 (same).

Bennett's claim appears to be the "vehicle by which she seeks" to vacate the ALJ's initial findings. Elgin, 132 S. Ct. at 2139. Indeed, the SEC investigated her for three years, but she did not file suit in district court until after the SEC instituted proceedings before the ALJ.[14] Free Enterprise--which focused on whether the claim was procedurally-entwined with the

---

[14] Bennett argues that if she had brought a pre-enforcement challenge in district court, the SEC would have moved to dismiss her claim as premature. How the SEC would have responded in this situation, let alone how a court would have ruled, is an attenuated hypothetical that cannot meaningfully inform our review. The fact remains that Bennett did not bring such a challenge.

proceeding--is instructive. There, "[p]etitioners' general challenge to the Board [wa]s 'collateral' to any Commission orders or rules from which review might be sought." See 561 U.S. at 490. Here, by contrast, Bennett's claim arises out of the enforcement proceeding and provides an affirmative defense. If she succeeds, Bennett will invalidate a Commission order. Therefore, her claim is not wholly collateral.

3.

The third Thunder Basin factor--agency expertise--also points toward precluding district-court jurisdiction. Bennett argues that her challenge to the constitutional sufficiency of ALJ appointments lies outside the SEC's expertise. Free Enterprise held as much, reasoning that an Appointments Clause challenge to the PCAOB raised only "standard questions of administrative law," rather than "fact-bound," industry-specific, or technical inquiries on which the SEC has special "competence and expertise." 561 U.S. at 491. Subsequently, however, in Elgin the Supreme Court "adopted a broader conception of agency expertise in the jurisdictional context." Tilton, 824 F.3d at 289; see also Hill, 825 F.3d at 1250–51; Bebo, 799 at 771; Jarkesy, 803 F.3d 28–29. There, the Court held that Congress had precluded jurisdiction, reasoning that the Merit Systems Protection Board could "apply its expertise" to "threshold questions that may accompany a constitutional

28

claim" against a federal statute, even when the agency disclaimed authority to resolve those constitutional claims. Elgin, 132 S. Ct. at 2140. The Court noted that the agency "might fully dispose of the case" or "alleviate constitutional concerns" by resolving "preliminary questions" or statutory questions it "routinely considers." Id. Thus, the agency's expertise could "be brought to bear." Id.

The Commission could bring its expertise to bear here by concluding that the Division of Enforcement's substantive claims are meritless, thereby fully disposing of the case before reaching the constitutional question. Indeed, the Supreme Court has emphasized that "one of the principal reasons to await the termination of agency proceedings is 'to obviate all occasion for judicial review.'" Standard Oil, 449 U.S. at 244 n.11 (quoting McGee v. United States, 402 U.S. 479, 484 (1971)). Although that may be unlikely to occur here, given that Bennett has apparently eschewed all other defenses,[15] as a matter of law, under Elgin the agency-expertise factor points toward precluding district-court jurisdiction.

---

[15] Neither Bennett nor her counsel appeared at the initial hearing. Bennett Grp. Fin. Servs., LLC, Exchange Act Release No. 1033, 2016 WL 4035560, at *2 (ALJ July 11, 2016) (default decision). Bennett does not challenge the merits or details of the specific SEC proceeding. Appellants' Br. at 2.

29

IV.

In § 78y, Congress established a comprehensive process for exclusive judicial review of final Commission orders in the federal courts of appeals. From the text and structure of the statute, it is fairly discernible that Congress intended to channel all objections to such orders--including challenges rooted in the Appointments Clause--through the administrative adjudication and judicial review process set forth in the statute. The three Thunder Basin factors indicate that Bennett's claims are of the type Congress intended to be reviewed within this framework. If the Commission rules against her, Bennett can obtain meaningful judicial review of her constitutional claims in a competent Article III court in due course. The wholly collateral and agency expertise factors also point toward preclusion.

Adopting Bennett's argument would provide no limiting principle: Anyone could bypass the judicial-review scheme established by Congress simply by alleging a constitutional challenge and framing it as "structural," "prophylactic," or "preventative." That conflicts with Elgin's admonition that distinguishing among types of constitutional claims for jurisdictional purposes is a fool's errand. And it conflicts with established precedent that Congress has the power to channel statutory and constitutional claims into administrative

30

adjudication in the first instance, so long as it provides for judicial review in an Article III court.  Cf. Crowell v. Benson, 285 U.S. 22 (1932).  Bennett cannot short-circuit that process.

Accordingly, the judgment of the district court is

AFFIRMED.