# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-30044

United States Court of Appeals
Fifth Circuit

**FILED**

March 28, 2019

Lyle W. Cayce
Clerk

BANK OF LOUISIANA; G. HARRISON SCOTT; SHARRY SCOTT; JOHNNY CROW,

Plaintiffs - Appellants

v.

FEDERAL DEPOSIT INSURANCE CORPORATION,

Defendant - Appellee

Appeal from the United States District Court
for the Eastern District of Louisiana

Before SMITH, DUNCAN, and ENGELHARDT, Circuit Judges.

STUART KYLE DUNCAN, Circuit Judge:

The Federal Deposit Insurance Corporation ("FDIC") brought two enforcement proceedings against the Bank of Louisiana and three of its directors (collectively, the "Bank") for violating federal banking laws. At the close of each proceeding, the FDIC Board ("Board") issued a final order penalizing the Bank. In turn, the Bank petitioned this court for review of both orders pursuant to 12 U.S.C. § 1818(h)(2), which vests "exclusive" jurisdiction to review final Board orders in the federal circuit courts. But the Bank also sued the FDIC in federal district court, alleging various constitutional violations arising out of the same enforcement proceedings. The sole issue on

No. 17-30044

appeal is whether the district court correctly dismissed the Bank's lawsuit for lack of subject matter jurisdiction. It did. We therefore AFFIRM.

## I.

## A.

Among its other responsibilities, the FDIC is authorized to investigate and institute proceedings against federally-insured banks and savings associations to prevent "unsafe or unsound practice[s]" and to enforce federal banking laws and regulations. *See* 12 U.S.C. §§ 1811, 1818(b); *see also Fed. Deposit Ins. Corp. v. Bank of Coushatta,* 930 F.2d 1122, 1124–26 (5th Cir. 1991) (discussing FDIC's "regulatory tools for dealing with troubled banks"). Exercising that authority, the FDIC may issue a notice of charges (12 U.S.C. § 1818(b)), hold hearings (*id.* § 1818(h))[1], issue cease-and-desist orders (*id.* § 1818(b), (c)), and levy monetary penalties (*id.* § 1818(i)).

This enforcement scheme includes "a comprehensive system for judicial review." *Rhoades v. Casey*, 196 F.3d 592, 597 (5th Cir. 1999) (citing *Bd. of Governors of Fed. Reserve Sys. of U.S. v. MCorp Fin., Inc.*, 502 U.S. 32, 37 (1991)). One may obtain judicial review of a final agency order "exclusively" by "filing in the [relevant] court of appeals of the United States … a written petition praying that the order of the agency be modified, terminated, or set aside." 12 U.S.C. § 1818(h)(1), (h)(2)[2]; *see also Rhoades*, 196 F.3d at 597 (explaining "a party may obtain review of [an] order issued by the banking agency by filing [a petition] in a Court of Appeals of the United States") (citing

---

[1] Such hearings "shall be conducted in accordance with the provisions of chapter 5 of Title 5," *id.*, meaning the rules concerning administrative hearings. *See, e.g.,* 5 U.S.C. § 556 (providing procedural and evidentiary rules for administrative hearings).

[2] "Review of such proceedings shall be had as provided in chapter 7 of Title 5," *id.*, meaning the rules concerning review of agency proceedings. *See, e.g.,* 5 U.S.C. § 706 (providing authority to review agency action, including "interpret[ing] constitutional and statutory provisions").

No. 17-30044

12 U.S.C. § 1818(h)(2)); *Groos Nat. Bank v. Comptroller of the Currency*, 573 F.2d 889, 894 (5th Cir. 1978) (explaining "[j]udicial review of final agency cease and desist orders is placed in the United States Circuit Courts of Appeal by 12 U.S.C. § 1818(h)"). Only in specific circumstances may federal district courts exercise jurisdiction over banking agency orders. For instance, upon issuance of a *temporary* cease-and-desist order, a bank "may apply to [a] United States district court … for an injunction setting aside, limiting, or suspending the enforcement, operation, or effectiveness of such order" pending completion of administrative proceedings. 12 U.S.C. § 1818(c)(2). And the agency itself may apply to a federal district court to enforce its orders. *See id.* § 1818(i)(1). However, unless otherwise provided, "no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any notice or order [under section 1818], or to review, modify, suspend, terminate, or set aside any such notice or order." *Id.*

We have described these procedures in section 1818 as "a detailed framework for regulatory enforcement and for orderly review of the various stages of enforcement." *Bd. of Governors of Fed. Reserve Sys. v. DLG Fin. Corp.*, 29 F.3d 993, 999 (5th Cir. 1994) (quoting *Groos*, 573 F.2d at 895). And we have emphasized that "[section] 1818(i) in particular"—the jurisdictional bar referenced above—"evinces a clear intention that this regulatory process is not to be disturbed by untimely judicial intervention[.]" *Id.*; *see also Rhoades*, 196 F.3d at 597 (noting "the Supreme Court [has] held that the plain, preclusive language of § 1818(i) 'provides us with clear and convincing evidence that Congress intended to deny the District Court jurisdiction to review and enjoin' administrative proceedings") (quoting *MCorp*, 502 U.S. at 44).

No. 17-30044

B.

The Bank is a New Orleans-based community bank founded in 1958 by G. Harrison Scott ("Scott") and his late partner, James Comiskey. Scott has been chairman of the Bank's Board of Directors since its founding and has served as the Bank's president since 2005. In October and November 2013, the FDIC brought two enforcement actions against the Bank, alleging violations of various banking laws and regulations. While those proceedings were pending at different stages, in August 2016 the Bank and three of its directors—Scott, Sharry Scott, and Johnny Grow—sued the FDIC in federal district court, alleging constitutional violations arising out of the enforcement actions. We recount the intertwined history of these actions in some detail.

The first enforcement proceeding began on October 22, 2013. The FDIC alleged that the three directors had caused the Bank to violate federal regulations over a two-year period, specifically by approving illegal loans in violation of Regulation O, 12 C.F.R. § 215.4, which limits the credit a bank can extend to its executives, directors, and principal shareholders. The directors were also charged with permitting Bank insiders to overdraw their accounts while avoiding overdraft fees. *See generally Scott v. FDIC*, 684 F. App'x 391 (5th Cir. 2017) (discussing charges against the Bank). Following briefing and an evidentiary hearing, the presiding administrative law judge ("ALJ") issued a decision on July 2, 2014, recommending a $10,000 civil penalty for each director in addition to costs and fees. On November 18, 2014, the Board adopted the ALJ's recommendation in a final order. On December 22, 2014, the directors petitioned our court for review. After staying the case pending resolution of the second enforcement proceeding, we issued an opinion on April 4, 2017, denying the directors' petition. *See id.* at 397.

4

No. 17-30044

The second enforcement proceeding began on November 1, 2013. The Bank was charged with operating in an unsafe and unsound manner and with violating provisions of the Bank Secrecy Act,[3] the Electronic Funds Transfer Act,[4] the Real Estate Settlement Procedures Act,[5] the Truth in Lending Act,[6] the Home Mortgage Disclosure Act,[7] and the National Flood Insurance Program.[8] The same ALJ from the first proceeding conducted a six-day trial and, on May 17, 2016, recommended that the FDIC impose a $500,000 civil penalty and order the Bank to cease and desist its violations. The Board adopted the ALJ's recommendation and issued a final order on November 15, 2016. *See Bank of La.*, FDIC-12-489b, FDIC-12-479k, 2016 WL 9050999 (Nov. 15, 2016). As relevant here, the Board concluded that the ALJ's "lengthy, detailed, and well-reasoned opinion" had "fully addressed" and properly rejected the Bank's arguments that the "FDIC's examiners were motivated by age discrimination against Scott," that the Bank was "denied due process" by certain ALJ rulings concerning document admissibility and witness sequestration, and that the ALJ was unconstitutionally appointed. *Id.* at *2, *11–13. On December 19, 2016, the Bank petitioned our court for review. We stayed proceedings pending the Supreme Court's decision in *Lucia v. SEC*, which subsequently held that Securities and Exchange Commission ALJs are "Officers of the United States" under the federal Constitution's Appointments Clause. *See* 138 S. Ct. 2044, 2049 (2018); U.S. CONST. art. II, § 2, cl. 2. On

---

[3] 31 U.S.C. § 5311 *et seq.*

[4] 15 U.S.C. § 1693 *et seq.*

[5] 12 U.S.C. § 2601 *et seq.*

[6] 15 U.S.C. § 1601 *et seq.*

[7] 12 U.S.C. § 2801 *et seq.*

[8] 42 U.S.C. § 4001 *et seq.*

September 5, 2018, we granted the FDIC's motion to remand the case to the agency in light of *Lucia*.

While the second proceeding was pending before the Board (and while the first proceeding was pending on appeal before us), the Bank filed the instant lawsuit in federal district court on August 4, 2016, claiming the FDIC committed constitutional violations during the enforcement proceedings. Specifically, the Bank alleged the FDIC denied it equal protection by targeting Scott, the Bank's president, due to his age.[9] The Bank further alleged the ALJ violated due process by preventing it from proffering certain evidence and by preventing Scott from talking with his counsel at certain points during the proceedings. These were the same constitutional claims considered and rejected by the ALJ and the Board during the second enforcement proceeding. *See Bank of La.,* 2016 WL 9050999 at *11–13.

The Bank originally sought a permanent injunction to prevent the Board from issuing a final order in the second proceeding; a declaratory judgment that the FDIC violated its constitutional and statutory rights during both enforcement proceedings; damages; sanctions; and attorney's fees. After the Board issued its second order on November 15, 2016, the Bank abandoned its requests for injunctive relief and damages, leaving only its request for declaratory judgment.

---

[9] For example, the Bank alleges that on January 29, 2013, an FDIC employee stated in an email to another employee, "[T]his place will never change until the old man dies." *But see Bank of La.,* 2016 WL 9050999 at *11–13 (noting that "the Bank has not identified any evidence of purported age discrimination that, if credited, likely would change the outcome of this proceeding" and concluding that "[w]hile this reference might be viewed in context as insensitive or unkind, it cannot fairly be read to demonstrate that FDIC staff harbored age-based animus toward [the Bank]").

No. 17-30044

The FDIC moved to dismiss the Bank's lawsuit for lack of subject matter jurisdiction, asserting that the statutory review scheme in 12 U.S.C. § 1818 precludes district court jurisdiction. The district court granted the FDIC's motion and dismissed the Bank's lawsuit without prejudice, emphasizing that the Bank could assert its claims in this court on direct review of the agency's final order. The Bank appeals.

## II.

We review a dismissal for lack of subject matter jurisdiction *de novo*, accepting all well-pleaded facts as true and viewing those facts in the light most favorable to the plaintiff. *Griener v. United States*, 900 F.3d 700, 703 (5th Cir. 2018). "As a court of limited jurisdiction, a federal court must affirmatively ascertain subject-matter jurisdiction before adjudicating a suit. A district court should dismiss where it appears certain that the plaintiff cannot prove a plausible set of facts that establish subject-matter jurisdiction." *Venable v. La. Workers' Comp. Corp.*, 740 F.3d 937, 941 (5th Cir. 2014) (cleaned up). A court may find that plausible set of facts by considering "(1) the complaint alone; (2) the complaint supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Spotts v. United States*, 613 F.3d 559, 565–66 (5th Cir. 2010) (citation omitted). The party asserting jurisdiction bears the burden of proof. *Griener*, 900 F.3d at 703.

## III.

"Within constitutional bounds, Congress decides what cases the federal courts have jurisdiction to consider," including "when, and under what conditions, federal courts can hear them." *Bowles v. Russell*, 551 U.S. 205, 212–13 (2007); *see also, e.g., La. Real Estate Appraisers Bd. v. Fed. Trade Comm'n*, 917 F.3d 389, 394 (5th Cir. 2019) (federal courts "cannot act without authority

No. 17-30044

from Congress or the Constitution") (citing *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994)). As a general matter, federal district courts have subject matter jurisdiction over all civil cases arising under the Constitution and federal law. U.S. CONST. art. III, § 2; 28 U.S.C. §§ 1331, 2201. But sometimes Congress leapfrogs district courts by channeling claims through administrative review and directly to federal appellate courts. *See Elgin v. Dep't of Treasury*, 567 U.S. 1, 9 (2012) (explaining Congress may "channel[ ] judicial review of a constitutional claim" through "a statutory scheme of administrative review followed by judicial review in a federal appellate court[,] [thereby] preclud[ing] district court jurisdiction") (citing *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 206 (1994)). In that event, federal district courts lack subject matter jurisdiction to hear those claims. *See, e.g., Arbaugh v. Y&H Corp.*, 546 U.S. 500, 515 n.11 (2006) (explaining "Congress has exercised its prerogative to restrict the subject-matter jurisdiction of federal district courts based on a wide variety of factors"); *Dresser v. Meba Med. & Benefits Plan,* 628 F.3d 705, 708 (5th Cir. 2010) (district court properly dismissed lawsuit as "an attempt to circumvent the channeled path for judicial review" when review scheme required appeal from agency "to a federal circuit court"). The question in this case is whether Congress established such a scheme in 12 U.S.C. § 1818, which is the regulatory process deployed by the FDIC in its enforcement proceedings against the Bank. If it did, then the district court lacked subject matter jurisdiction over the Bank's separate lawsuit challenging the constitutionality of those proceedings.

Congress may preclude district court jurisdiction either explicitly or implicitly. To discern an explicit preclusion, we examine whether "the text … expressly limit[s] the jurisdiction that other statutes confer on district courts,"

such as 28 U.S.C. § 1331. *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010); *see also, e.g., Elgin*, 567 U.S. at 25 (Alito, J., dissenting) (explaining that, "[w]hen dealing with an express preclusion clause … we determine the scope of preclusion simply by interpreting the words Congress has chosen") (citing *Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 5 (2000)).

To discern an implicit preclusion, we engage in a more complex analysis. We first ask whether it is "fairly discernible" from the "text, structure, and purpose" of the statutory scheme that Congress intended to preclude district court jurisdiction. *Elgin*, 567 U.S. at 10 (quoting *Thunder Basin*, 510 U.S. at 207). We then ask whether the "claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure.'" *Free Enter. Fund*, 561 U.S. at 489 (quoting *Thunder Basin*, 510 U.S. at 212). To help  answer that second question, the Supreme Court has identified three "factors," sometimes referred to as the "*Thunder Basin* factors." *See Thunder Basin*, 510 U.S. at 212–13. Specifically, we inquire (1) whether precluding district court jurisdiction "could foreclose all meaningful judicial review"; (2) whether the Bank's "suit is wholly collateral to a statute's review provisions"; and (3) whether its claims are "outside the agency's expertise." *Elgin*, 567 U.S. at 15 (quoting *Free Enter. Fund,* 561 U.S. at 489; *Thunder Basin*, 510 U.S. at 212–13). Several of our sister circuits have used this framework to analyze an administrative review scheme in SEC enforcement proceedings. *See, e.g., Jarkesy v. SEC*, 803 F.3d 9, 12 (D.C. Cir. 2015) (applying this "framework" to determine "whether Congress intended exclusivity when it established the statutory scheme" for reviewing SEC enforcement orders in 15 U.S.C. § 78y(a)(1) and similar statutes); *see also Bennett v. SEC*, 844 F.3d 174, 181 (4th Cir. 2016); *Hill v. SEC*, 825 F.3d 1236, 1241 (11th Cir. 2016); *Tilton v.*

*SEC*, 824 F.3d 276, 281 (2d Cir. 2016); *Bebo v. SEC*, 799 F.3d 765, 768–69 (7th Cir. 2015). We find that framework helpful in confronting the analogous question presented here.

A.

The parties and the district court addressed the question presented under the implicit preclusion analysis, and we therefore do the same. Consequently, we first ask whether it is "fairly discernible" from the text, structure, and purpose of 12 U.S.C. § 1818 that Congress intended to preclude district court jurisdiction over the Bank's claims against the FDIC. Agreeing with the FDIC, the district court concluded that its jurisdiction was precluded by the "clear text" of § 1818(i)(1). That subsection provides that, unless otherwise allowed, "no court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement or any notice or order under [§ 1818], or to review, modify, suspend, terminate, or set aside any such notice or order." *Id.*

On appeal, the Bank makes no argument with respect to this first step of the analysis. In fact, the Bank "concedes that it is fairly discernible from the face of … § 1818 that Congress intended to limit the jurisdiction of district courts over certain claims seeking review of FDIC Board actions." The Bank instead reserves its arguments for the three *Thunder Basin* factors, which, it claims, show Congress did not intend to preclude its claims. *See infra* III.B.

The Bank wisely concedes that the section 1818 scheme displays Congress' intent to preclude district court jurisdiction over claims against the FDIC arising out of enforcement proceedings. Our precedent virtually compels that concession. Even setting aside the specific jurisdictional bar in section 1818(i)(2), we have described the section 1818 scheme as a "comprehensive system for judicial review" of agency orders, *Rhoades*, 196 F.3d at 597, and a "detailed framework … for orderly review of the various stages of enforcement,"

No. 17-30044

*DLG Financial*, 29 F.3d at 999 (quoting *Groos*, 573 F.2d at 895); *see supra* I.A. Following an administrative hearing, the Board reviews the ALJ's recommendation *de novo* and issues a final order, which is routed for "exclusive" review directly to a federal appellate court. *See* 12 U.S.C. § 1818(h)(1)–(2). District court jurisdiction is prescribed only in specific circumstances not present here. *See id.* § 1818(a)(8)(D), (c)(2), (d), (f), (i)(1), (i)(2)(I)(i), (n). This calibrated structure is, for present purposes, materially the same as review structures the Supreme Court and sister circuits have found expressive of Congress' intent to preclude district court jurisdiction. *See, e.g., Bennett*, 844 F.3d at 181–82; *Hill*, 825 F.3d at 1242–45; *Tilton*, 824 F.3d at 281–82; *Jarkesy,* 803 F.3d at 16–17.

Furthermore, if the general section 1818 scheme were not enough to show Congress' preclusive intent, the jurisdictional bar in section 1818(i)(1) ices the cake. Both the Supreme Court and our court have "held that the plain, preclusive language of § 1818(i) 'provides … clear and convincing evidence that Congress intended to deny the District Court jurisdiction to review and enjoin' administrative proceedings." *Rhoades*, 196 F.3d at 597 (quoting *MCorp*, 502 U.S. at 44). We have added that this section "evinces a clear intention that [the section 1818] regulatory process is not to be disturbed by untimely judicial intervention[.]" *DLG Fin. Corp.*, 29 F.3d at 999. And we have held that the section's specific prohibition against affecting agency orders "by injunction *or otherwise*" encompasses declaratory relief, which is what the Bank seeks. *See Groos*, 573 F.2d at 895. Thus, as the FDIC correctly argues, the plain text of section 1818(i)(1) makes this case easier than the sister-circuit cases, which interpreted an SEC enforcement scheme lacking a similarly explicit jurisdictional bar. *Cf., e.g., Bennett*, 844 F.3d at 177; *Jarkesy,* 803 F.3d at 13.

11

Indeed, so robust is the section 1818(i)(1) bar that, on appeal, the FDIC invites us to stop there and decline to analyze the three *Thunder Basin* factors. It is a tempting offer. After all, the *Thunder Basin* factors are a judge-made test for discerning whether we should *presume* Congress has left district court jurisdiction unimpaired. *See, e.g., Elgin*, 567 U.S. at 15 (the *Thunder Basin* factors invoke "our 'presum[ption] that Congress does not intend to limit [district court] jurisdiction'") (quoting *Free Enter. Fund*, 561 U.S. at 489). Because the plain terms of section 1818(i) bar jurisdiction here, the FDIC sensibly urges that "no court-created presumption can change that result."[10]

Despite the attractiveness of this argument, we think it prudent to cycle through the *Thunder Basin* factors, as did the district court. Those factors reinforce the conclusion that the review scheme precludes district court jurisdiction over the Bank's claims.

### B.

We proceed to the three *Thunder Basin* factors, which help determine whether the "claims at issue 'are of the type Congress intended to be reviewed within th[e] statutory structure.'" *Free Enter. Fund*, 561 U.S. at 489 (quoting *Thunder Basin*, 510 U.S. at 212). Under those factors, "we presume that Congress does not intend to limit [district court] jurisdiction [1] if 'a finding of

---

[10] Although unclear, the FDIC may effectively be arguing that section 1818(i) "explicitly" limits the jurisdiction conferred on federal district courts by statutes like 28 U.S.C. § 1331. *See Free Enter. Fund*, 561 U.S. at 489 (explaining Congress may "expressly limit the jurisdiction that other statutes confer on district courts"). There is some authority for that proposition. *See Abercrombie v. Office of Comptroller of Currency*, 833 F.2d 672, 677 (7th Cir. 1987) (holding that "§ 1818(i)(1) … expressly and unequivocally deprived the district courts of jurisdiction over [civil money penalty] assessments by the Comptroller under § 1818(i)(2)(i)"). We note, however, that section 1818(i) does not reference other jurisdictional statutes explicitly. *Cf., e.g., Shalala*, 529 U.S. at 5 (addressing clause providing that "no action" on any Medicare claim "shall be brought under section 1331 … of title 28"). In any event, we need not resolve that issue because of our holding that the statutory scheme withdraws district jurisdiction implicitly.

preclusion could foreclose all meaningful judicial review'; [2] if the suit is 'wholly collateral to a statute's review provisions'; and [3] if the claims are 'outside the agency's expertise.'" *Free Enter. Fund,* 561 U.S. at 489 (quoting *Thunder Basin*, 510 U.S. at 212–13) (brackets added). In the Bank's view, each factor shows Congress did not intend to limit district court jurisdiction over its claims against the FDIC. We consider each factor in turn.

1.

The Bank argues that the section 1818 scheme fails to provide "meaningful judicial review" because the ALJ allowed only "limited discovery" that "did not afford [it] adequate opportunity to uncover the remainder of the evidence bearing on" its age discrimination and due process claims. The district court correctly rejected this argument.

The Supreme Court has held that Congress provides meaningful judicial review by authorizing review of challenges to a final agency order by a federal circuit court. *See Elgin*, 567 U.S. at 17 (concluding the Civil Service Reform Act afforded meaningful review by "provid[ing] review in the Federal Circuit, an Article III court fully competent to adjudicate petitioners' [constitutional] claims"); *Thunder Basin*, 510 U.S. at 215 (concluding "petitioner's statutory and constitutional claims" regarding the Federal Mine Safety and Health Amendments Act "can be meaningfully addressed in the Court of Appeals"); *see also Bennett*, 844 F.3d at 186 (concluding petitioner "can obtain meaningful judicial review of her constitutional claims under [the Securities Exchange Act] by proceeding in the administrative forum and raising her claims in a federal court of appeals in due course"); *Tilton*, 824 F.3d at 286–87 (concluding that "appellants will have access to meaningful judicial review of their Appointments Clause claim through administrative channels" which include review in a circuit court); *Jarkesy*, 803 F.3d at 20 (observing that "the SEC

scheme presents an entirely meaningful avenue of relief" given that "a court of appeals is available to hear … challenges" to the Commission's final order) (internal quotation marks deleted). Indeed, there can be meaningful review in the circuit court even if the agency itself lacks authority to decide the constitutional question presented. *See, e.g., Elgin*, 567 U.S. at 17 (concluding court of appeals can provide meaningful review of constitutional challenge "'[e]ven if' the administrative body could not decide the constitutionality of a federal law") (quoting *Thunder Basin*, 510 U.S. at 215); *see also Jarkesy*, 803 F.3d at 19 (concluding Commission's lack of authority to address constitutional questions "is of no dispositive significance" because petitioner's constitutional claims "can eventually reach an Article III court fully competent to adjudicate them") (cleaned up).

The statutory scheme at issue in this case authorizes review of final Board orders in a federal circuit court. *See* 12 U.S.C. § 1818(h)(2); *Rhoades*, 196 F.3d at 597. Based on that alone, the scheme would provide meaningful judicial review of the Bank's claims that the enforcement proceedings were tainted by constitutional violations. *See, e.g., Bebo*, 799 F.3d at 767 (holding meaningful judicial review not foreclosed because, "[i]f aggrieved by the SEC's final decision, [petitioner] will be able to raise her constitutional claims in this circuit or in the D.C. Circuit"). But there is more: The Bank in fact raised its constitutional claims during the enforcement proceedings, and both the ALJ and the Board addressed them. As the Board observed, the ALJ wrote a "lengthy, detailed, and well-reasoned opinion" that "fully addressed" the Bank's age discrimination, due process, and separation-of-powers claims. 2016 WL 9050999 at *2, 11. The Board in turn reviewed, and approved, the ALJ's recommendations. For instance, the Board rejected the Bank's age discrimination claim as based on "speculation" that "cannot surmount the

ample evidence in the record showing the legitimate regulatory concerns that prompted each of [the FDIC's] actions." *Id.* at \*11; *see also id.* at \*12–13 (reviewing and agreeing with ALJ's rejection of the Bank's due process claims); *id.* at \*13 (reviewing and agreeing with ALJ's rejection of the Bank's Appointments Clause challenge to ALJ authority). The Bank then sought our review of the Board's order—and actually obtained relief when we granted the FDIC's motion to remand the case in light of the Supreme Court's *Lucia* decision. *See Bank of La. v. FDIC,* No. 16-60837 (5th Cir. Sept. 5, 2018) (order). If this is not "meaningful judicial review" of the Bank's constitutional claims, we do not know what would qualify.

The Bank's situation is therefore unlike the one in *Free Enterprise Fund*, where a plaintiff would have had to "bet the farm" to obtain judicial review of his claim. In that case, the Supreme Court concluded that the Sarbanes-Oxley Act did not provide meaningful judicial review of a challenge to the constitutionality of the pertinent agency board. 561 U.S. at 489–91. Under the applicable review scheme, the petitioner would have had to voluntarily "*incur a sanction*" at the board level to raise its constitutional claim in the circuit court, risking "severe punishment should its challenge fail." *Id.* at 490. The Supreme Court "d[id] not consider this a 'meaningful' avenue" for a constitutional challenge, *id.* at 491 (quoting *Thunder Basin*, 510 U.S. at 212), because plaintiffs typically need not "'bet the farm … by taking the violative action'" before challenging a law's validity. *Free Enter. Fund*, 561 U.S. at 490 (quoting *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007); *see also McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496–97 (1991) (finding no meaningful review for aliens' denial of special worker status when circuit review could be obtained "only if [aliens] voluntarily surrender[ed] themselves for deportation"). We have nothing like that here. The Bank was "already

embroiled in an enforcement proceeding" and so "need not take *any* additional risks" to assert its constitutional claims. *Bennett*, 844 F.3d at 186. Unlike in *Free Enterprise Fund*, then, the Bank did not have to "bet the farm" to challenge agency action. The farm was already on the table.

The only argument the Bank seriously presses on appeal is that the ALJ "barred [it] from developing the factual record necessary" to support its constitutional claims. This is hyperbole. Elsewhere in its briefs, the Bank concedes that the ALJ allowed it "limited discovery" and complains only that "[t]he ALJ denied *some* of the Bank's requests for discovery" (emphasis added). This is hardly grounds to accuse the agency of denying "meaningful review" of the Bank's claims: Discovery requests may just as likely be rejected by district courts as by agencies. *See Jarkesy*, 803 F.3d at 22 (observing that the petitioner's "[discovery] requests might well have met the same result had he attempted them in the district court").

In any event, numerous courts, including the Supreme Court, have consistently rejected similar arguments based on agency fact-finding capacities. In *Elgin*, for example, the Supreme Court held that the pertinent review scheme "fully accommodate[d] [the claimant's] potential need to establish facts relevant to his constitutional challenge," by empowering the agency to take evidence and find facts. 567 U.S. at 19. Several sister circuits have reached the same conclusion.[11]

---

[11] *See, e.g., Hill*, 825 F.3d at 1249–50 (holding the tools available in the administrative process, such as the ability to call witnesses, "do not leave [a plaintiff] without a meaningful avenue to develop the record"); *Jarkesy*, 803 F.3d at 21 (explaining that the administrative process does not "categorically preclude [petitioner] from accessing the evidence he believes he needs"); *Bebo*, 799 F.3d at 773 (concluding an agency's "fact-finding capacities, even if more limited than a federal district court's, are sufficient for meaningful judicial review").

We have no reason to doubt that the review scheme here similarly provides adequate tools for developing the necessary record for the Bank's claims. As the Bank correctly concedes on appeal, the FDIC "is equipped to do fact-finding." The pertinent statute expressly incorporates the procedural and evidentiary accoutrements typical of administrative proceedings—including the power to issue subpoenas, take evidence, and order depositions. 12 U.S.C. § 1818(h); *see also* 5 U.S.C. § 556(c)(2)–(4) (authorizing agency hearing officer to "issue subp[o]enas authorized by law," to "rule on offers of proof and receive relevant evidence," and to "take depositions or have depositions taken when the ends of justice would be served"). Finally, even assuming the Bank is correct and the ALJ wrongly curtailed discovery our court could remand to the agency for further factfinding, which underscores the point that the scheme provides meaningful judicial review of the Bank's claims. *See Jarkesy*, 803 F.3d at 22 (observing that, "should the [administrative record … prove inadequate," the court of appeals "always has the option of remanding to the agency for further factual development") (internal quotation marks and citations omitted).[12]

In sum, a finding that the review scheme precludes district court jurisdiction would not "'foreclose all meaningful judicial review'" of the Bank's constitutional claims. *Free Enter. Fund*, 461 U.S. at 489 (quoting *Thunder Basin*, 510 U.S. at 489). This factor therefore points toward finding that the district court lacked subject matter jurisdiction.

---

[12] The Bank also suggests there is an inherent "conflict" in the process (essentially because the FDIC is investigating its own practices) that "hamstrung" its ability to develop its claims. The Bank points to nothing in the record even hinting that any "conflict" in the administrative process lay behind the ALJ's discovery rulings. Nor does the Bank cite any authority for the proposition that a supposed "conflict" forecloses meaningful judicial review—especially when the scheme provides a right of review by a federal circuit court.

2.

Turning to the second *Thunder Basin* factor, the Bank argues that its claims are "wholly collateral" to the administrative scheme because they did not "challenge … the merits of the FDIC's final order in either proceeding," but "[i]nstead … challenged the unconstitutional animus behind the [FDIC] investigation and the attendant denial of due-process rights." The district court correctly rejected this argument.

The Bank's constitutional claims arise directly from alleged irregularities in the agency enforcement proceedings. And the Bank raised those same claims as defenses in the second enforcement proceeding. *See Bank of La.,* 2016 WL 9050999 at *11–13. The Bank's claims are thus "inextricably intertwined with the conduct of the very enforcement proceeding the statute grants the [FDIC] the power to institute and resolve as an initial matter." *Jarkesy*, 803 F.3d at 23 (cleaned up). In other words, those claims "do not arise 'outside' the [FDIC] administrative enforcement scheme—they arise from actions the [FDIC] took in the course of that scheme." *Id*. We therefore cannot consider the Bank's claims "'wholly collateral' to the [FDIC enforcement] scheme." *Elgin*, 567 U.S. at 21; *see also Bennett*, 844 F.3d at 187 (claim not collateral to agency proceedings when the "claim arises out of the enforcement proceeding and provides an affirmative defense"); *Tilton*, 824 F.3d at 288 (explaining claim was not "*wholly* collateral" to the administrative scheme when the "claim arose directly from [the agency] enforcement action and serves as an affirmative defense within the proceeding").

The Bank counters that, in applying this factor, we should instead focus on the substantive relationship between its claims and the agency proceedings, and thus find that the Bank's claims are "substantively collateral to the banking-law issues the FDIC was examining." It is true that a few circuits have

suggested this as a possible approach to the wholly collateral factor. For example, while not adopting it, the Second Circuit has observed that one "competing approach[ ]" is to ask whether the claim is "substantively intertwined with the merits dispute that the proceeding was commenced to resolve." *Tilton*, 824 F.3d at 287; *see also Hill*, 825 F.3d at 1251 (noting that one "way[ ] to understand this factor" is to "compare the merits of the … constitutional claims to the substance of the [administrative] charges"); *Bebo*, 799 F.3d at 773 (a possible approach is to "focus on the relationship between the merits of the constitutional claim and the factual allegations against the plaintiff in the administrative proceeding").

We need not decide whether focusing on substance over procedure is the proper way to apply the wholly collateral factor. Even assuming we should look only to substance, we would still find the Bank's claims are not *wholly* collateral to the agency proceedings. As we have seen, the Bank's age discrimination and due process claims allege agency misdeeds *during* the enforcement proceedings themselves. Thus, we would still find those claims "substantively intertwined with the merits dispute that the proceeding was commenced to resolve." *Tilton*, 824 F.3d at 287; *see also, e.g., Jarkesy*, 803 F.3d at 14 (concluding plaintiffs' "various allegations of violations of their constitutional rights … are inextricably intertwined with the conduct of the very enforcement proceeding the statute grants the SEC the power to institute and resolve as an initial matter"). Indeed, in rejecting those claims, the Board examined the merits of the underlying agency action, underscoring the point that the Bank's claims are intertwined both substantively and procedurally with the agency proceedings. *See Bank of La.,* 2016 WL 9050999 at *11–15.

In sum, the Bank has not shown that its "suit is wholly collateral to [the] statute's review provisions." *Elgin*, 567 U.S. at 15 (quoting *Free Enter. Fund*,

561 U.S. 477, 489). Therefore, this factor also points toward finding that the district court lacked subject matter jurisdiction.

3.

Turning to the third and final *Thunder Basin* factor, the Bank argues that its constitutional claims are "beyond the special expertise of the FDIC." Once again, the district court correctly rejected this argument.

*Elgin* is instructive here. In that case, the Supreme Court explained that courts should not "overlook the many threshold questions that may accompany a constitutional claim and to which the [agency] can apply its expertise." *Elgin*, 567 U.S. at 22. They should instead consider whether the agency's "expertise can otherwise be brought to bear on [claims] that challenge the constitutionality of a statute." *Id.* at 23; *see also Tilton*, 824 F.3d at 289 (noting *Elgin* "adopted a broader conception of agency expertise in the jurisdictional context"); *Jarkesy,* 803 F.3d at 28–29 (explaining "*Elgin* … clarified ... that an agency's relative level of insight into the *merits* of a constitutional question is not determinative"). For example, in *Elgin* the agency deployed its employment law expertise to resolve "threshold questions" before considering the constitutionality of the Selective Service Act. 567 U.S. at 23; *see also Tilton*, 824 F.3d at 290 (discussing *Elgin*'s recognition of "those potential applications of agency expertise to other dimensions of the administrative proceeding").

Following *Elgin*'s lead, our sister circuits have identified various ways an agency might deploy its expertise on constitutional questions. The agency might "resolv[e] accompanying statutory claims that it routinely considers, and which might fully dispose of the case in the appellants' favor." *Tilton*, 824 F.3d at 290 (internal quotation marks omitted). Or an "agency could moot the need to resolve [a] challenge to [a statute's] constitutionality (or any other constitutional question) by finding that he did not commit the … violations of

which he stands accused." *Jarkesy*, 803 F.3d at 29. Additionally, an agency's interpretation of the law "in the course of the proceeding … might answer or shed light on" a constitutional challenge. *Id.* As the D.C. Circuit observed in *Jarkesy*, "there are precious few cases involving interpretation of statutes authorizing agency action in which our review is not aided by the agency's statutory construction." *Id.* at 29 (quoting *Mitchell v. Christopher*, 996 F.2d 375, 379 (D.C. Cir. 1993) (internal quotation marks omitted)).

Following *Elgin* and our sister circuits, we conclude that the Bank's constitutional claims did not fall outside the agency's expertise. To begin with, the FDIC could have mooted the Bank's constitutional claims by finding the Bank innocent of the statutory violations it was accused of committing. *Elgin*, 567 U.S. at 23; *Jarkesy*, 803 F.3d at 29. At a minimum, the agency's banking expertise could have shed light on the Bank's constitutional claims, which turned largely on why the agency brought charges and on how the hearing was conducted. *Elgin*, 567 U.S. at 22–23; *Tilton*, 824 F.3d at 29. As it happens, that is just what occurred. The Board rejected the Bank's theory that the FDIC's investigation was motivated by age-based animus by reviewing "the ample evidence in the record showing the *legitimate regulatory concerns* that prompted each of [the FDIC's] actions." *Bank of La.,* 2016 WL 9050999 at *11 (emphasis added). Similarly, the Board rejected the Bank's due process claims by reviewing the ALJ's rulings in light of the substantive issues addressed at the hearing.[13] It is thus evident that the agency actually brought its expertise to bear in resolving the bulk of the Bank's constitutional claims.

---

[13] *See id.* at *12 (examining whether certain exhibits excluded by the ALJ were "crucial to [the Bank's] case or would have changed the outcome," and noting that "[n]one of these exhibits undermine the ALJ's conclusion that a preponderance of the evidence shows multiple violations of law and supports the examiners' less-than-satisfactory ratings in multiple areas"); *id.* (concluding the ALJ's "sequestration rule" did not violate due process

No. 17-30044

To be sure, the Bank's separation-of-powers challenge to the ALJ does not directly implicate the agency's expertise in the way the Bank's other constitutional claims do. But this is not dispositive under *Elgin*. As the D.C. Circuit correctly explained, in *Elgin* the Supreme Court "clarified … that an agency's relative level of insight into the *merits* of a constitutional question is not determinative" for purposes of the agency expertise factor. *Jarkesy*, 803 F.3d at 28; *see also, e.g., Hill*, 825 F.3d at 1250–51 (because the agency's decision on statutory claims could moot constitutional claims, "[w]e are satisfied that the [agency's] expertise could be brought to bear in this way, even if its expertise could offer no added benefit to the resolution of the constitutional claims themselves"); *Tilton*, 824 F.3d at 289 (emphasizing "that an agency may bring its expertise to bear indirectly, by resolving accompanying, potentially dispositive issues in the same proceeding").

In sum, the agency expertise factor does not show that "Congress intended to exempt [the Bank's constitutional] claims from exclusive review before [the FDIC] and the [courts of appeal]." *Elgin*, 567 U.S. at 23. Therefore, this factor also points toward finding that the district court lacked subject matter jurisdiction over the Bank's claims.

## IV.

In sum, the district court correctly dismissed the Bank's lawsuit without prejudice for lack of subject matter jurisdiction. We therefore AFFIRM the district court's judgment.[14]

---

"[b]ecause the ALJ made clear that the sequestration rule applied, only to a discussion of Scott's and other witnesses' testimony while Scott's testimony was in progress" and did not "prevent Scott from discussing strategic matters with the Bank's counsel").

[14] The Bank's motion to supplement the record excerpts, which was carried with this appeal, is DENIED.